**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Easter Unlimited, Inc. d/b/a Fun World,

                       Plaintiff,

               -against-

Terry Rozier,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

No. 18 Civ. 6637-JFB-ARL


**MEMORANDUM OF LAW IN SUPPORT OF TERRY ROZIER'S**
**MOTION FOR SUMMARY JUDGMENT**


Patrick S. Kabat
315 Madison Avenue, 3rd Floor
New York, NY 10017
Telephone: 646.979.3820
patrick@poetsandpatrons.org

Paul J. Safier
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: 215.988.9146
Facsimile: 215.864.8999
safierp@ballardspahr.com

*Counsel for Defendant Terry Rozier*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ....................................................................................... 2

I.     THE "SCARY TERRY" PERSONA AND APPAREL ...................................... 2

II.    EASTER UNLIMITED, *SCREAM*, AND THE REAL ORIGINS OF THE "GHOST FACE" MASK .................................................................................... 6

III.   THIS LAWSUIT ............................................................................................... 8

ARGUMENT ................................................................................................................ 9

I.     ROZIER IS ENTITLED TO SUMMARY JUDGMENT ON EASTER UNLIMITED'S COPYRIGHT CLAIMS (COUNTS 1-3) .................................. 9

       A.    Easter Unlimited Does Not Own The Copyright In The Mask Design Because It Is Not The Original Author Of The Mask .............................. 9

       B.    The Use Of The Mask Image On The Scary Terry Apparel Was A Non-Infringing Fair Use ....................................................................... 10

             1.    The Purpose And Character of Defendants' Use Heavily Favors A Finding of Fair Use ..................................................... 10

             2.    The Nature Of The Copyrighted Work Is At Worst A Neutral Factor, and Should Be Accorded Little Weight ......................... 12

             3.    The Amount And Substantiality Of The Portion Used Weighs Heavily In Favor Of Fair Use ..................................................... 13

             4.    The Use Has No Effect On The Potential Market ..................... 13

II.    ROZIER IS ENTITLED TO SUMMARY JUDGMENT ON EASTER UNLIMITED'S TRADEMARK CLAIMS ....................................................... 14

       A.    Easter Unlimited Cannot Prevail On Either Of Its Trademark Infringement Claims (Counts 4 & 5) .................................................... 14

             1.    Easter Unlimited Has Not Used The "Ghost Face" Image In Which It Is Claiming Trademark Rights As A Mask ................... 15

2.      Even If Easter Unlimited Were Claiming Trademark Rights In The Mask, It Cannot Demonstrate That The Mask Has Acquired Secondary Meaning..................................................16

3.      Easter Unlimited Cannot Demonstrate Any Likelihood Of Consumer Confusion Arising Out Of Rozier's Use Of The Mask In The Cartoon Featured On His Clothing......................18

B.   Easter Unlimited Cannot Prevail On Its Claim For Trademark Dilution Claim (Count 6) ......................................................................24

CONCLUSION......................................................................................................25

ii

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*1-800 Contacts, Inc. v. WhenU.com, Inc.*,
    414 F.3d 400 (2d Cir. 2005)......................................................................................14

*Aerogroup Int'l v. Marlboro Footworks*,
    977 F. Supp. 264 (S.D.N.Y. 1997)...........................................................................17

*Aini v. Sun Taiyang Co.*,
    964 F. Supp. 762 (S.D.N.Y. 1997)...........................................................................15

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006)................................................................................10, 12

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006)............................................................................10, 12, 13

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994).......................................................................................11, 12, 13

*Cariou v. Prince*,
    714 F.3d 694 (2d Cir. 2013)......................................................................10, 11, 13, 14

*Cartier, Inc. v. Sardell Jewelry, Inc.*,
    294 F. App'x 615 (2d Cir. 2008) .............................................................................18

*CCA & B, LLC v. F + W Media Inc.*,
    819 F. Supp. 2d at 1322 (N.D. Ga. 2011) ...........................................................12, 13

*Christian Laboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*,
    696 F.3d 206 (2d Cir. 2012)......................................................................................17

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*,
    886 F.2d 490 (2d Cir. 1989)................................................................................20, 22

*Cornett v. Graver*,
    2020 U.S. Dist. LEXIS 127221 (W.D. Pa. July 20, 2020) ......................................20

*Davis v. The Gap, Inc.*,
    246 F.3d 152 (2d Cir. 2001).....................................................................................10

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003)....................................................................................................9

*Forschner Grp., Inc. v. Arrow Trading Co.*,
    124 F.3d 402 (2d Cir. 1997).....................................................................................17

*Gruner + Jahr USA Publ'g v. Meredith Corp.*
 991 F.2d 1072 (2d Cir. 1993)....................................................................22

*Gucci American, Inc. v. Duty Free Apparel, Ltd.*,
 286 F. Supp. 2d 284 (S.D.N.Y. 2003)........................................................14

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
 73 F.3d 497 (2d Cir. 1996).................................................................21, 22

*Ill. Tool Works, Inc. v. J-B Weld Co., LLC*,
 2020 U.S. Dist. LEXIS 112894 (D. Conn. June 26, 2020)..........................14

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
 456 U.S. 844 (1982)...................................................................................17

*Jackson v. Odenat*,
 9 F. Supp. 3d 342 (S.D.N.Y. 2014)............................................................19

*Jahr USA Publishing v. Meredith Corp.*,
 991 F.2d 1072 (2d Cir. 1993)....................................................................22

*Keeling v. Hars*,
 809 F.3d 43 (2d Cir. 2015).........................................................................11

*Leigh v. Warner Brothers*,
 212 F.3d 1210 (11th Cir. 2000) .................................................................16

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
 507 F.3d 252 (4th Cir. 2007) ..........................................................12, 13, 24

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*,
 156 F. Supp. 3d 425 (S.D.N.Y. 2016)...............................12, 13, 20, 23, 24

*Malco Leaf, A.B. v. Promotion in Motion, Inc.*,
 287 F. Supp. 2d 355 (S.D.N.Y. 2003)........................................................17

*Mana Prods. v. Columbia Cosmetics Mfg.*,
 65 F.3d 1063 (2d Cir. 1995).......................................................................18

*Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*,
 290 F.3d 98 (2d Cir. 2002)...........................................................................9

*Nabisco, Inc. v. Warner-Lambert Co.*,
 220 F.3d 43 (2d Cir. 2000).........................................................................19

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
 269 F.3d 114 (2d Cir. 2001).......................................................................19

*NXIVM Corp. v. Ross Inst.*,
364 F.3d 471 (2d Cir. 2004)................................................................................11

*Polaroid Corp. v. Polarad Electronics Corp.*,
287 F.2d 492 (2d Cir. 1961)..............................................................18, 19, 20, 21

*Scholastic Inc. v. Speirs*,
28 F. Supp. 2d 862 (S.D.N.Y. 1998)..........................................................15, 16, 19

*Schutte Bagclosures, Inc. v. Kwik Lok Corp.*,
193 F. Supp. 3d 245 (S.D.N.Y. 2016)....................................................................21

*Thoroughbred Legends, LLC v. Walt Disney Co.*,
2008 U.S. Dist. LEXIS 19960 (N.D. Ga. Feb. 12, 2008) ....................................16

*Tiffany (NJ) Inc. v. eBay Inc.*,
600 F.3d 93 (2d Cir. 2010)....................................................................................24

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*,
221 F. Supp. 2d 410 (S.D.N.Y. 2002)..................................................20, 21, 23, 24

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
996 F.2d 1366 (2d Cir. 1993)...............................................................................20

*Universal City Studios, Inc. v. Nintendo Co.*,
746 F.2d 112 (2d Cir.1984)...................................................................................20

*Universal City Studios, Inc. v. T-Shirt Gallery, Ltd.*,
634 F. Supp. 1468 (S.D.N.Y. 1986)......................................................................21

*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*,
529 U.S. 205 (2000)..............................................................................................17

**Statutes**

15 U.S.C. § 1125..........................................................................................................24

17 U.S.C. § 102..............................................................................................................9

17 U.S.C. § 107...............................................................................................10, 11, 13

**Other Authorities**

Fed. R. Civ. P. 37......................................................................................................9, 16

4 McCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 24.122.............................24

## PRELIMINARY STATEMENT

Defendant Terry Rozier is a professional basketball player who started his career with the Boston Celtics.  During his break-out third season, he was dubbed "Scary Terry" by his fans and members of the sports media.  To take cement his bond with Celtics fans, and share an important image from his past, Rozier came out with a line of t-shirts and hoodies to embrace the "Scary Terry" persona.  While many different "Scary Terry" shirts and hoodies were produced, the one at issue in this lawsuit featured the words "Scary Terry" and a cartoon version of Rozier in his Celtics uniform wearing a mask like that worn by the killers in the landmark horror movie *Scream*.  The mask, in addition to being an homage to a movie that held personal significance for him, used the "Scary Terry" persona to add cheery humor to a deadly character, and invoke the familiar trope of professional athletes as remorseless "killers."

Defendant Easter Unlimited, Inc. d/b/a Fun World ("Easter Unlimited") is a costume and novelty-item manufacturer that claims certain intellectual property rights relating to the mask featured in *Scream*.  Easter Unlimited has sued Rozier for copyright and trademark infringement based on the "Scary Terry" clothing.

Rozier is entitled to summary judgment on Easter Unlimited's copyright claims for two principal reasons.  First, Easter Unlimited is not the real owner of the mask, as the evidence demonstrates that the mask was previously created by someone else, and Easter Unlimited failed to produce any facts in discovery that would permit it to contest those facts now.  Second, even if Easter Unlimited did own a copyright in the mask, Rozier's use of an image of the mask as part of satirical cartoon celebrating the "Scary Terry" persona was a protected fair use.

Rozier is entitled to summary judgment on Easter Unlimited's trademark claims for three principal reasons.  First, Easter Unlimited is not claiming trademark ownership in the mask itself, only an image of the mask, and there is no evidence that it ever used that image specifically as a

1

mark, *i.e.*, to denote its brand, rather than any particular product sold under its brand.  Second, even if Easter Unlimited were claiming trademark rights in the mask itself, it has no such rights because there is no evidence that the public associates the mask with Easter Unlimited, as opposed to *Scream*.  Third, regardless of what kind of trademark rights Easter Unlimited is claiming, it cannot show any likelihood of consumer confusion arising from Rozier's use of the mask image on Rozier-branded apparel that was clearly parodying the movie *Scream*, not claiming affiliation with the movie or with Easter Unlimited.

Rozier is, accordingly, entitled to summary judgment on each of Easter Unlimited's claims.

**FACTUAL BACKGROUND**

**I.    THE "SCARY TERRY" PERSONA AND APPAREL**

Rozier is a professional basketball player, who currently plays for the Charlotte Hornets in the National Basketball Association ("NBA").  Rozier's Statement of Material Facts Not Genuinely in Dispute ("SUMF") ¶ 1.  He started his NBA career with the Boston Celtics organization, which drafted him in the first round of the 2015 NBA draft.  SUMF ¶ 2.

The events giving rise to this lawsuit occurred during Rozier's third year in the NBA, when he went from a relatively obscure bench performer to an NBA standout and favorite among Celtics fans.  SUMF ¶¶ 2-5, 27-31.  During that season, Rozier experienced success on the court filling in for the Celtics' star point guard, Kyrie Irving, and, as a result, acquired a reputation around the league as a dangerous scorer and fearless shooter.  SUMF ¶¶ 2-5, 27-31.  Celtics fans and members of the sports media began calling Rozier "Scary Terry," a nickname meant to invoke, in a humorous way, the fear his explosive scoring outbursts supposedly instilled in Celtics' opponents.  SUMF ¶¶ 5-6.

2

Once the "Scary Terry" persona took off, Rozier decided to come out with a line of t-shirts and hoodies to celebrate the "Scary Terry" persona and to capitalize on his emerging celebrity.  SUMF ¶ 7.  Rozier and his management team determined that the clothing line would feature the name "Scary Terry," as well as a cartoon drawing of Rozier accompanied by a mask associated with a serial killer from popular horror.  SUMF ¶ 8.  The serial killer mask was selected as a way to poke fun both at the "Scary Terry" persona and the common practice of referring to professional athletes—especially hot-shooting point guards—as remorseless "killers."  SUMF ¶ 9.

Rozier and his team hired Glen Infante, a popular mural artist, to draw the cartoon. SUMF ¶ 11.  The original version of the cartoon depicted Rozier wearing a hockey mask like the Jason character in the *Friday the 13th* movies.  SUMF ¶ 12.  Here is an image of that version of the "Scary Terry" cartoon:



SUMF ¶ 13.  Rozier asked that a version of cartoon also be done that invoked the mask from the *Scream* movies.  SUMF ¶ 14.  That change was made for sentimental reasons, rather than out of marketing considerations.  SUMF ¶¶ 15-16.  *Scream* is one of Rozier's favorite movies and was

very important to him growing up, where its mix of violence and humor provided escapism and solace during a childhood spent surrounded by violence.  SUMF ¶ 16.  During the offseason immediately preceding the year in which Rozier acquired the "Scary Terry" nickname, Rozier had memorialized his affection for the movie by getting a tattoo of the mask from *Scream*. SUMF ¶ 17.

Although the "Scary Terry" clothing featured multiple different cartoons, the specific one at issue in this lawsuit showed a cartoon image of Rozier in his Celtics uniform wearing a stylized version of the *Scream* mask over the words "Scary Terry."  SUMF ¶ 18.   Here is picture of Rozier wearing that version of the "Scary Terry" t-shirt, which Rozier posted to his Instagram account on February 15, 2018:



SUMF ¶ 19.  Initially, Rozier and his team had around 500 "Scary Terry" shirts and hoodies made, which Rozier marketed through his social media accounts and a dedicated website. SUMF ¶¶ 20-21.  That changed during that year's playoffs, when Rozier helped lead the Celtics on a surprise run to the Eastern Conference Finals while filling in for an injured Kyrie Irving.

SUMF ¶ 22.  That led to a surge in popularity for the "Scary Terry" persona.  SUMF ¶ 23.

Rozier and his team had more "Scary Terry" apparel made and authorized Barstool Sports, I

Love Boston Sports, and ISlide USA to sell the merchandise.  SUMF ¶¶ 24-25.

     Both the "Scary Terry" phenomenon and the associated clothing line were the subject of

significant media attention during that NBA season.  SUMF ¶ 26.  While those media reports, in

discussing the "Scary Terry" clothing line, typically mentioned the *Scream* mask and the movie's

importance to Rozier personally, they all unambiguously linked the clothing to Rozier's

emerging celebrity and the "Scary Terry" phenomenon, not the movie (or Easter Unlimited,

which went unmentioned in all of the articles).  SUMF ¶¶ 32-24.  For instance, an article

published by the national sports website *SB Nation* in May 2018 stated that the Celtics' playoff

run "made Rozier a folk hero in Boston, where Scary Terry shirts have become ubiquitous

around the [Boston] Garden.  Rozier has embraced his following."  SUMF ¶ 27.   In March 2018,

the *Boston Globe* published an article entitled "Here's how 'Scary Terry' Rozier came to be a

thing" that connected the "Scary Terry" apparel to "Rozier's camp" having witnessed the "hype

escalating around a new moniker, 'Scary Terry.'"  SUMF ¶ 28.  In May 2018, the popular

website *The Ringer* published an article entitled "Heeeere's Scary Terry!" that included a photo

of Rozier with his "Scary Terry" shirt, and stated: "The shirts' message is hard to miss: You may

not have known who Scary Terry was before, but if you've been paying attention to the injury-

riddled Celtics in the playoffs to date, you do now."  SUMF ¶ 29.  Shortly before the Celtics

were scheduled to face the Cleveland Cavaliers in the Eastern Conference Finals that year,

*cleveland.com* published an article entitled "Who created 'Scary Terry' Rozier persona for

Boston Celtics guard?  It's a Cleveland story" that informed Cavaliers fans that "[w]hen you

watch the Cavaliers take on the Celtics in Game One of the Eastern Conference Finals in Boston

Sunday, you are likely to see fans, maybe even players on the bench, sporting 'Scary Terry' T-shirts."  SUMF ¶ 30.  And, after the season, *GQ* published a lengthy profile of Rozier that began with the following: "In the summer of 2017, Boston Celtics guard Terry Rozier got a tattoo of the Scream mask.  Back then, he wasn't yet Scary Terry, the NBA's unexpected killer.  He was just Kyrie Irving's promising young backup, who had started exactly zero NBA games.  Then, last season happened: Irving got hurt, Rozier stepped on to fill an All-NBA-sized void, tore through the NBA playoffs . . ., helped get the Celtics one w[in] from winning an Eastern Conference their injury-addled team had no business winning, and sold more than 10,000 shirts with a cartoon Terry Rozier in a *Scream* mask.  The legend of 'Scary Terry' was born."  SUMF ¶ 31.

The marketing for the "Scary Terry" clothing was similarly focused on Rozier and the "Scary Terry" brand.  SUMF ¶ 35.  The apparel was marketed specifically as Rozier merchandize primarily to Rozier's social media followers.  SUMF ¶ 36.  No effort was made to suggest that the clothing was in any way officially affiliated with the *Scream* movies.  SUMF ¶ 37.  In addition, nothing was done to suggest any affiliation between the clothing and Easter Unlimited.  SUMF ¶¶ 38-39.  In all, Rozier received approximately $150.000 in gross sales revenue from the sale of the "Scary Terry" clothing.  SUMF ¶ 40.

## II.    EASTER UNLIMITED, *SCREAM,* AND THE REAL ORIGINS OF THE "GHOST FACE" MASK

Easter Unlimited is a New York business that "designs, manufactures and markets products for Halloween" and other holidays.  SUMF ¶ 41.  Its products principally consist of "costumes, masks, holiday items and novelty gifts."  SUMF ¶ 42.  The product Easter Unlimited sells that is most relevant to this lawsuit is the so-called "Ghost Face" mask, which was used in the movie *Scream*.  SUMF ¶ 43.  Easter Unlimited licensed that mask for use in that movie.

SUMF ¶ 44.  Easter Unlimited admits that the mask became famous and popular specifically as a result of its appearance in *Scream*.  SUMF ¶ 45.

Easter Unlimited claims various intellectual property rights related to the mask.  It claims a copyright in the mask, attesting, in its copyright registration papers, that the mask was first "published" on December 4, 1991.[1]  SUMF ¶¶ 47-48.  It is also claims certain associated trademark rights.  Specifically, Easter Unlimited claims rights to the word mark "Ghost Face," which is not implicated in this lawsuit.  SUMF ¶ 50.  And, Easter Unlimited claims rights in a "design mark" consisting of an image of a figure wearing the mask while holding a knife over the words "Ghost Face."  SUMF ¶ 51.  Easter Unlimited is not claiming any trademark rights in the product configuration of the "Ghost Face" mask itself.  SUMF ¶ 53.

Though Easter Unlimited contends that it "is the original designer of the Ghost Face Mask," SUMF ¶ 46, as set forth in detail in the accompanying Declaration of Tony Gardner, that is not the case.  Gardner and his colleagues at Alterian Studios, Inc. ("Alterian") designed that mask (which is itself derived from the famous Edvard Munch painting "Scream") in 1990 and 1991, well before Easter Unlimited's purported first publication of the mask in December 1991.  SUMF ¶¶ 60-63.  From 1991 through 1993, Gardner and Alterian marketed that mask extensively throughout the country, including at trade shows sponsored by Easter Unlimited.  SUMF ¶¶ 66-67.  By 1994, Gardner and Alterian stopped selling masks, and moved on to assisting with movie production, which was their principal focus.  SUMF ¶ 69.  Here is an image, from early 1991, of Alterian's "Wailer" mask, which is the one that ended up in *Scream:*

---

[1] Easter Unlimited's copyright registration for the mask identifies the work being copyrighted as a "sculpture."  SUMF ¶ 49.  Throughout this litigation, Easter Unlimited has failed to identify what exactly it purported to copyright in relation to the "Ghost Face" mask.



WAILER

SUMF ¶ 63.

## III.    THIS LAWSUIT

Easter Unlimited filed its lawsuit against Rozier on November 20, 2018 and filed its

Amended Complaint on March 14, 2019.  SUMF ¶¶ 76-78.  Easter Unlimited is asserting claims

for direct, contributory, and vicarious copyright infringement (Counts 1-3), for trademark

infringement (Count 4), for trademark counterfeiting (Count 5), and for trademark dilution by

blurring (Count 6).  SUMF ¶ 80.  Rozier is entitled to summary judgment on each of those

claims because there are no material facts in dispute and he is entitled to judgment as a matter of

law.

## ARGUMENT

I. **ROZIER IS ENTITLED TO SUMMARY JUDGMENT ON EASTER UNLIMITED'S COPYRIGHT CLAIMS (COUNTS 1-3).**

Rozier is entitled to summary judgment on each of Easter Unlimited's three copyright claims. That is because the undisputed record establishes that (1) Easter Unlimited is not the actual owner of the copyright in the "Ghost Face" mask, and (2) the use of an image of the mask as part of the cartoon featured on the "Scary Terry" clothing was a non-infringing "fair use."

### A. Easter Unlimited Does Not Own The Copyright In The Mask Design Because It Is Not The Original Author Of The Mask.

Copyright protects only original works of authorship—*i.e.*, works original to their author and not copied from preexisting works. *Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 107 (2d Cir. 2002); *see also* 17 U.S.C. § 102 (copyright ownership is premised on "original . . . authorship"). But, as set forth above, Easter Unlimited is not the original creator of the "Ghost Face" mask. The mask was created and marketed by Alterian in 1990 and 1991. SUMF ¶¶ 60-68. Thus, to the extent that the mask is copyrightable at all, Alterian is its lawful owner. *See Eldred v. Ashcroft*, 537 U.S. 186, 195 (2003) ("[F]ederal copyright protection . . . run[s] from the work's creation.").

Moreover, Easter Unlimited cannot, at this stage, contest any facts related to Alterian's authorship. During discovery, Easter Unlimited failed to provide any evidence supporting its authorship of the mask, including by refusing to respond to an interrogatory requesting the factual basis for its contention "that 'Plaintiff is the original designer of the Ghost Face Mask.'" SUMF ¶¶ 81-82. Having made that choice, Easter Unlimited cannot now use such evidence (if it exists) for purposes of defeating summary judgment. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion . . . , unless the failure was substantially

9

justified or is harmless."). Thus, Rozier is entitled to summary judgment on Easter Unlimited's copyright claims on the ground that Easter Unlimited is not the rightful owner of a copyright in the mask.

**B.   The Use Of The Mask Image On The Scary Terry Apparel Was A Non-Infringing Fair Use.**

Even if Easter Unlimited could claim ownership of the copyright to the "Ghost Face" mask, Rozier would still be entitled to summary judgment on the copyright claims. Rozier's use of the image of the mask was fair, which is a complete defense to copyright infringement. *See* 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work . . . is not an infringement of copyright."). The Copyright Act specifies four factors that must be considered to determine whether a particular use is fair: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use on the market for the original. *Id.* This is "an open-ended and context-sensitive inquiry." *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013) (citations omitted). For the reasons explained below, the four fair-use factors weigh decidedly in Rozier's favor.

**1.   The Purpose And Character of Defendants' Use Heavily Favors A Finding of Fair Use.**

The first statutory factor, the purpose and character of the use, is "[t]he heart of the fair use inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (quoting *Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001)). In applying this factor, courts look principally at whether the defendant used the material for a different or "transformative" purpose than the original. *Id.* at 251-52; *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006) ("Most important to the court's analysis of the first factor is the

10

'transformative' nature of the work.").[2]  Thus, "the more transformative the new work, the less

will be the significance of other factors, like commercialism, that may weigh against a finding of

fair use."  *Campbell v. Acuff-Rose Music,Inc.*, 510 U.S. 569, 579 (1994) (citation omitted); *see*

*also Keeling v. Hars*, 809 F.3d 43, 53 (2d Cir. 2015) ("As a legal matter, the four factors do not

each carry equal weight . . . indeed, some may not be relevant at all. . . .  [T]he first factor —'the

purpose and character of the use'—lies at the heart of the inquiry . . . while the other three factors

are much less important." (internal marks and citations omitted)), *cert. denied Hars v. Keeling*,

136 S. Ct. 2519 (2016).

A work is "transformative" when the new work does not "merely supersede[ ] the objects

of the original creation" but "adds something new, with a further purpose or different character,

altering the first with new expression, meaning or message[.]"  *Campbell*, 510 U.S. at 579

(citations omitted).  "For a use to be fair, it 'must be productive and must employ the quoted

matter in a different manner or for a different purpose from the original.'"  *Cariou*, 714 F.3d at

706 (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111

(1990)).  That indisputably applies here.  The "Scary Terry" t-shirts and hoodies incorporated a

stylized cartoon version of the mask to create an object very different than the original—namely,

a humorous article of clothing that commented on Rozier's "Scary Terry" persona, satirized the

familiar trope of professional athletes as remorseless "killers," and marked its wearer as a Rozier

fan.  The mask image was used solely to invoke the *Scream* movie with which the mask is

---

[2] The other two criteria courts examine in applying the first fair-use factor are whether
the material was used for any of the preamble purposes set forth in the Copyright Act, such as
"criticism, comment, news reporting, teaching, scholarship, or research," 17 U.S.C. § 107, and
whether the defendant is a for-profit or non-profit entity.  *NXIVM Corp. v. Ross Inst.*, 364 F.3d
471, 478 (2d Cir. 2004).  Here, Rozier used the mask image for purposes of commentary, and the
for-profit nature of the use merits little consideration where, as here, the use was transformative.
*Id.*

associated, and to create humor through the melding of the image of a celebrity basketball player and an image associated with fictional serial killers.  That is a classic fair use.  *See Campbell*, 510 U.S. at 579 ("Parody has an obvious claim to transformative value . . . [providing] social benefit by shedding light on an earlier work, and, in the process, creating a new one.").

In analogous contexts, courts routinely hold that, where a product marketed to consumers has altered a well-known copyrighted image for purposes of parody or satire, the use qualifies as a fair use.  *See, e.g., Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 269-70 (4th Cir. 2007) (chew toys for dogs that incorporated Louis Vuitton's copyrighted design for purposes of satire were protected by fair use); *Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425, 444-45 (S.D.N.Y. 2016) (same as to novelty tote bags that also incorporated Louis Vuitton's copyrighted design for purposes of satire); *CCA & B, LLC v. F + W Media Inc.*, 819 F. Supp. 2d 1310, 1321-22 (N.D. Ga. 2011) (use of copyrighted image of elf from *Elf on the Shelf* books in context of parody that placed elf in humorous settings was a transformative fair use).  The same applies here.  Thus, the first, and most important, fair use factor overwhelmingly favors a finding of fair use.

### 2.     The Nature Of The Copyrighted Work Is At Worst A Neutral Factor, and Should Be Accorded Little Weight.

The second fair-use factor—the nature of the copyrighted work—is at worst a neutral factor and should not affect the analysis.  First, "the second fair-use factor has limited weight" when, as here, the use is transformative.  *Blanch*, 467 F.3d at 257; *see also Bill Graham Archives*, 448 F.3d at 612 ("the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose.").  Second, as a general matter, "the second factor, the nature of the copyrighted work, does not provide much help in a parody case, since parodies almost invariably copy publicly known, expressive works."  *Louis Vuitton*, 156 F.

12

Supp. 3d at 445 ((internal marks and citation omitted); *CCA & B*, 819 F. Supp. 2d at 1322

(noting that "[t]his factor is generally neutral in parody cases, due to their reliance on well-

known creative works").  Thus, this factor does not favor either party.

> **3.** **The Amount And Substantiality Of The Portion Used Weighs Heavily In Favor Of Fair Use.**

As to the third factor, "the amount and substantiality of the portion used in relation to the

copyrighted work as a whole," 17 U.S.C. § 107, a court considers not just the quantity used, but

"whether the quantity and value of the materials used are reasonable in relation to the purpose of

the copying." *Cariou*, 714 F.3d at 710 (alteration omitted) (quoting *Blanch*, 467 F.3d at 257).

The secondary use "'must be [permitted] to "conjure up" at least enough of the original' to fulfill

its transformative purpose." *Id*. (quoting *Campbell*, 510 U.S. at 588).  This factor weighs heavily

in favor of fair use.  First, the "Scary Terry" clothing did not incorporate an exact reproduction

of the mask Easter Unlimited claims to own.  Rather, it incorporated a stylized cartoon image of

the mask.  Second, the clothing's use of the image was "reasonable in relation" to its purpose.

*Cariou*, 714 F.3d at 710 (citation omitted).  The joke inherent in placing that mask on the head of

Rozier to illustrate the "Scary Terry" persona only lands if the mask is successfully invoked.  *See*

*Louis Vuitton*, 156 F. Supp. at 445 (use of copyrighted Louis Vuitton pattern in satirical tote bag

was "reasonable in relation to the purpose of the use—after all, . . . totes must successfully

conjure Louis Vuitton's handbags to make sense").  Thus, this factor also cuts in favor of fair

use.

> **4.** **The Use Has No Effect On The Potential Market.**

Finally, the fourth factor overwhelmingly weighs in favor of fair use.  This factor centers

on whether the use at issue "usurps the market of the original work." *Cariou*, 714 F.3d at 708.

A secondary use "usurps" the market "where the infringer's target audience and the nature of the

infringing content is the same as the original." *Id.* at 709.  That is plainly not the case here.  The mask image, as incorporated in the "Scary Terry" clothing, is significantly transformed as compared to the original, and, more importantly, the two products have very different target audience.  Easter Unlimited sells costumes and novelty item for holidays.  SUMF ¶ 42.  It does not sell sports apparel, let alone sell it specifically to fans of Rozier and the "Scary Terry" persona, who were the target market for the "Scary Terry" apparel.  SUMF ¶¶ 35-36.  Thus, this factor favors fair use.

*     *     *     *     *

Rozier's use was fair as a matter of law, and he is entitled to summary judgment on the copyright claims for that additional reason.

## II.    ROZIER IS ENTITLED TO SUMMARY JUDGMENT ON EASTER UNLIMITED'S TRADEMARK CLAIMS.

Rozier is likewise entitled to summary judgment on Easter Unlimited's three trademark claims.

### A.    Easter Unlimited Cannot Prevail On Either Of Its Trademark Infringement Claims (Counts 4 & 5).

To prevail on its trademark infringement claims (Counts 4 & 5), Easter Unlimited must prove, at a minimum, that (1) "it has a valid mark that is entitled to protection under the Lanham Act," and (2) Rozier's purported use of that mark is likely to cause consumer confusion.[3]  *1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005).  Easter Unlimited

---

[3] As a technical matter, Count 5 is a claim for trademark counterfeiting, not trademark infringement.  However, "[o]ne who counterfeits necessarily infringes a trademark, but one who merely infringes a trademark may not have counterfeited." *Ill. Tool Works, Inc. v. J-B Weld Co., LLC*, 2020 U.S. Dist. LEXIS 112894, at *2 (D. Conn. June 26, 2020) (citing *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003)).  Because Easter Unlimited cannot prove trademark infringement, it is not necessary to address whether it can prove counterfeiting.

cannot make either showing.  First, it cannot show that it has a valid mark because (1) to the extent that it is claiming trademark ownership in an *image* of the "Ghost Face" mask, it has not used that image as a mark, and (2) to the extent that it is claiming trademark ownership in the configuration of the mask itself, the mask has not acquired secondary meaning as an identifier of Easter Unlimited's brand.  Second, even if Easter Unlimited could establish that it possesses a protectable mark, it cannot show that Rozier's incorporation of the mask was likely to cause consumer confusion as to the relationship between the clothing and Easter Unlimited.

> **1.** **Easter Unlimited Has Not Used The "Ghost Face" Image In Which It Is Claiming Trademark Rights As A Mark.**

Though Easter Unlimited has, in this litigation, touted the fame and popularity of the "Ghost Face Mask," SUMF ¶ 45, it is not asserting trademark ownership in the actual mask. Rather, it is claiming trademark ownership of a "design mark" consisting of an image of a figure wearing the mask while holding a knife over the words "Ghost Face."  SUMF ¶¶ 51, 53. However, there is no evidence that Easter Unlimited has used that design as a mark, *i.e.*, as a designation of its brand, as opposed to as an image of a particular product sold under its brand.

The law is clear that "[t]o create trademark or trade dress rights[,] a designation must be proven to perform the job of identification: to identify one source and distinguish it from other sources." *Scholastic Inc. v. Speirs*, 28 F. Supp. 2d 862, 870 (S.D.N.Y. 1998).  In other words, "[o]ne . . . may not 'own' a trademark unless one uses the mark as a designation of origin on or in connection with goods or services made or furnished by or under one's control."  *Aini v. Sun Taiyang Co.*, 964 F. Supp. 762, 774 (S.D.N.Y. 1997).  Here, there is no evidence that Easter Unlimited has used the image in which it is claiming trademark ownership to denote its brand. Rozier is not aware of any instances of Easter Unlimited using that image as a logo or its equivalent in any marketing materials or on any products, and Easter Unlimited did not plead any

such uses.  Nor, if such examples exist, can Easter Unlimited invoke them now, as it did not provide any such examples in discovery, despite being asked to do so.  *See* Fed. R. Civ. P. 37(c)(1).  It is possible that Easter Unlimited has used that image in marketing materials specifically to refer to the "Ghost Face" mask, though that it produced no such examples in discovery.  But, that would not save its trademark claims because that would not be a use of the image as a mark.  Courts routinely reject trademark claims where the image or phrase in which the plaintiff is claiming trademark rights was used to identify particular products, rather than their origin.  *See e.g.*, *Leigh v. Warner Bros.*, 212 F.3d 1210, 1218 (11th Cir. 2000) (affirming grant of summary judgment to defendant on trademark infringement claim over use of plaintiff's photograph where plaintiff's marketing materials had "use[d] the . . . photograph descriptively, as an example of [plaintiff's] work, rather than as a trademark"); *Scholastic Inc.*, 28 F. Supp. 2d at 870-71 (granting summary judgment to defendant on trademark infringement claim over use of images where images had not been "used to distinguish goods in commerce or to denote their source," and "none function[ed] to distinguish anything other than the image itself"); *Thoroughbred Legends, LLC v. Walt Disney Co.*, 2008 U.S. Dist. LEXIS 19960, at *14 (N.D. Ga. Feb. 12, 2008) (granting summary judgment on trademark infringement claim over use of word "RUFFIAN" where "Plaintiffs fail[ed] to show that the alleged 'RUFFIAN' mark was in fact ever used to signify origin to customers and competitors").  The same applies here, and Rozier should be granted summary judgment on the trademark claims on this ground.

> **2.     Even If Easter Unlimited Were Claiming Trademark Rights In The Mask, It Cannot Demonstrate That The Mask Has Acquired Secondary Meaning.**

Even if Easter Unlimited is understood to be claiming trademark rights in the mask itself—as opposed to in an image of the mask—that would not save its trademark infringement claims.  The Supreme Court has made clear that where a party is claiming trademark protection

in a product design, it must prove that its design has acquired secondary meaning and cannot rely on any purported distinctiveness adhering in the product design itself. *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 215 (2000). That means that Easter Unlimited must show that, "'in the minds of the public, the primary significance'" of its mask design "'is to identify the source of the product rather than the product itself.'" *Christian Laboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)); *see also Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 408 (2d Cir. 1997) ("an element of trade dress . . . may be a protected trademark only when it has attained secondary meaning and has come to be associated in the consuming public's mind with a single source of origin").

Easter Unlimited cannot show that the "Ghost Face" mask has acquired secondary meaning as an identifier of its particular brand. Easter Unlimited admits that the mask became famous and popular as a result of its appearance in *Scream*. SUMF ¶ 45. That underscores the weakness of any consumer association between the mask and Easter Unlimited. It is well established that licensing use of a mark to third-parties who use it under different branding dilutes the mark's association with the original licensor. *See, e.g.*, *Malco Leaf, A.B. v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 369-70 (S.D.N.Y. 2003) (because plaintiff permitted its product to be sold under different branding, product design lacked distinctiveness required to be protectable as a mark); *Aerogroup Int'l v. Marlboro Footworks*, 977 F. Supp. 264, 267-68 (S.D.N.Y. 1997) (same). That is what occurred here. Easter Unlimited cannot point to any evidence indicating that the public associates the mask with Easter Unlimited, not *Scream*. Thus, Easter Unlimited cannot claim trademark rights in the configuration of the mask.

This same conclusion follows from an application of the traditional secondary meaning factors. Those factors are: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product; (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use" *Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 F. App'x 615, 618 (2d Cir. 2008). There is no evidence in the record that would permit a factfinder to find, based on application of those factors, that the mask has acquired secondary meaning as an identifier of Easter Unlimited's brand. Easter Unlimited can point to no consumer-survey evidence suggesting such a link. Rozier is aware of no unsolicited media coverage—other than coverage of this lawsuit—that identifies the mask with Easter Unlimited as opposed to the *Scream* movies. And, during discovery, Easter Unlimited declined to provide any evidence bearing on those secondary-meaning factors (such as, for instance, evidence of advertising expenditures or sales success). The absence of any record evidence showing that the secondary meaning factors cut in Easter Unlimited's favor is a sufficient ground on which to grant summary judgment to Rozier. *See Mana Prods. v. Columbia Cosmetics Mfg.*, 65 F.3d 1063, 1071 (2d Cir. 1995) (granting summary judgment to defendant where plaintiff failed to submit evidence relating to the secondary meaning factors).

### 3. Easter Unlimited Cannot Demonstrate Any Likelihood Of Consumer Confusion Arising Out Of Rozier's Use Of The Mask In The Cartoon Featured On His Clothing.

Finally, regardless of whether Easter Unlimited is understood to be asserting trademark rights in an image of the mask, or the mask itself, its trademark infringement claims fail for the additional reason that Easter Unlimited cannot meet its burden to show that Rozier's use was likely to cause any consumer confusion.

This conclusion follows as a matter of basic common sense and does not require detailed application of the traditional consumer-confusion factors set out in *Polaroid Corp. v. Polarad*

18

*Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).[4]  As is the case with any merchandise featuring a sports celebrity (such as a LeBron James t-shirt or hat), the brand the "Scary Terry" apparel exploited to attract consumers was the celebrity's own brand.  *Cf. Jackson v. Odenat*, 9 F. Supp. 3d 342, 355 (S.D.N.Y. 2014) (noting generally that "[s]everal courts have recognized that celebrities have a trademark-like interest in their individual personas"); *see also* SUMF ¶¶ 27-34 (describing multiple news reports focused on Rozier and the "Scary Terry" phenomenon). The apparel was centered on Rozier's name and likeness: it featured a clear image of Rozier in his Boston Celtics uniform over his well-known nickname, "Scary Terry."  As the press coverage of, and the marketing for, the "Scary Terry" apparel make clear, the apparel was identified with Rozier's "Scary Terry" persona and the explosion of popularity it experienced during the Celtics' 2017-2018 season.  SUMF ¶¶ 27-39.  Rozier fans looking to buy Rozier-branded apparel would not have been confused into thinking the apparel was affiliated with another brand.  Nor, for that matter, would a fan specifically of the *Scream* mask be interested in purchasing apparel that was centered on the name and likeness of a professional basketball player.  The clear association of the "Scary Terry" apparel with Rozier's brand eliminates any likelihood of consumer confusion. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001) ("presence of . . . prominent and distinctive label" identifying product with defendant's brand "negates any possibility of a likelihood of confusion.").

   This same conclusions is affirmed by direct application of the *Polaroid* factors.  In applying the *Polaroid* factors, it is important to be mindful of the specific way in which the

---

[4] The Second Circuit has emphasized that where, as here, consumer confusion is highly unlikely, a court may rule on the "ultimate question" of whether consumers are likely to be confused without explicit consideration of each *Polaroid* factor.  *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000); *see also Scholastic Inc.*, 28 F. Supp. 2d at 871-72 (noting that "there is no need to apply the *Polaroid* test reflexively—or even at all—" where absence of likelihood of confusion is obvious).

"Scary Terry" apparel used the cartoon drawing of the *Scream* mask – *i.e.*, in the context of a

joke, or parody, about the "Scary Terry" name and the use of the label "killers" for professional

athletes.  "[A]s the Second Circuit has recognized, normal application of the *Polaroid* test, which

developed in the context of 'purely commercial exploitation,' is 'at best awkward in the context

of parody, which must evoke the original and constitutes artistic expression." *Louis Vuitton*, 156

F. Supp. 3d at 441 (quoting *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886

F.2d 490, 495 n.3 (2d Cir. 1989)).  That is because, "the parodist is not trading on the good will

of the trademark owner to market its own goods; rather, the parodist's sole purpose for using the

mark is parody itself, and precisely for that reason, the risk of consumer confusion is at its

lowest."  *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 414

(S.D.N.Y. 2002).

    For that reason, courts routinely reject trademark infringement claims based on the use of

a mark as part of humor or parody, even in the context of consumer products.[5]  *See, e.g.*,

*Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir.1984) (affirming grant of

summary judgment on trademark claims based on use of King Kong mark in videogame Donkey

Kong because "the fact that Donkey Kong so obviously parodies the King Kong theme strongly

contributes to dispelling confusion on the part of consumers"); *Louis Vuitton*, 156 F. Supp. 3d at

---

[5] As the court recognized in *Tommy Hilfiger*, where, as here, "a mark is used on products
whose principal purpose is to convey a message, such as posters or T-shirts," the full First
Amendment protections apply to the use of the mark.  221 F. Supp. 2d at 415 n.4; *see also
Cornett v. Graver*, 2020 U.S. Dist. LEXIS 127221, at *31-36 (W.D. Pa. July 20, 2020) (t-shirts
using plaintiff's image for purposes of communicating satirical message were not commercial
speech for purposes of trademark claims).  Thus, at a minimum, Easter Unlimited is required to
make a "particularly compelling" showing of likelihood of consumer confusion.  *Twin Peaks
Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993).  Here, Rozier can easily
prevail even without application of that heightened standard because "the joke is clear enough to
result in no confusion under the statutory likelihood of confusion analysis."  *Tommy Hilfiger*,
221 F. Supp. 2d at 416.

440-44 (granting summary judgment to marketer of novelty tote bags that invoked Louis Vuitton mark for purposes of humor because of absence of likelihood of confusion); *Tommy Hilfiger*, 221 F. Supp. at 416-21 (granting summary judgment to marketer of perfume for pets that closely mirrored and parodied Tommy Hilfiger brand because of absence of likelihood of confusion); *Universal City Studios, Inc. v. T-Shirt Gallery, Ltd.*, 634 F. Supp. 1468, 1477 (S.D.N.Y. 1986) ("Miami Mice" t-shirts that mimicked logo of "Miami Vice" television show for purposes of parody did not present likelihood of confusion because "[t]he strength of this parody highlights the differences between the two products and should further dispel any confusion on the part of consumers that plaintiffs manufactured, authorized sponsored, or were in any way connected with the t-shirts").

Application of the *Polaroid* factors, taking into account the satirical fashion in which the clothing used the *Scream* allusion, shows that the same result should be reached here.  Factor one ("Strength of Plaintiff's Mark") cuts against Easter Unlimited for the reasons discussed above with respect to secondary meaning – there is little, if any, association between the *Scream* mask and Easter Unlimited's brand.  *See Schutte Bagclosures, Inc. v. Kwik Lok Corp.*, 193 F. Supp. 3d 245, 275 (S.D.N.Y. 2016) (analysis of mark's strength mirrors secondary meaning analysis). Moreover, even if Easter Unlimited could claim the benefit of the mask's association with *Scream* (which it cannot), that would still cut against any likelihood of confusion.  As discussed above, where a mark is used in the context of humor, the strength of the mark cuts against likelihood of confusion because satire works only where mark being satirized is recognizable. *See Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 503 (2d Cir. 1996) (use of distinctive SPAM mark in Muppet's parody was not source of confusion because, "[w]here the

21

plaintiff's mark is being used as part of a jest or commentary . . . [and] both plaintiff's and defendant's marks are strong, well-recognized, . . . confusion is avoided . . . .").

Factor two ("Similarity Between the Marks") also cuts against any likelihood of confusion.  Leaving aside that the vast visual differences between the mask image on Rozier's clothing and Easter Unlimited's purported "design mark," *see* SUMF ¶¶ 18-19, 51, the similarity analysis focuses not simply on a comparison of the two marks, but also on the "overall impression" created by the parties' respective uses and "the context in which they are found." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993); *see also Hormel Foods*, 73 F.3d at 503 (same).  Rozier used the mask as part of a cartoon depicting and celebrating his "Scary Terry" persona, which leaves a very different impression than Easter Unlimited's use (*i.e.*, as a costume sold to consumers).  In addition, as noted above, using a mark in order to satirize or parody it requires invoking the actual mark since, otherwise, the joke will not work.  That does not make the use a source of confusion.  *See, e.g.*, *Cliffs Notes*, 886 F.2d at 494-97 (finding spoof of *Cliffs Notes*, which "surely conjure[d] up the original and [went] to great lengths to use some of the identical colors and aspects of the cover design of Cliffs Notes," presented no real risk of confusion as to source).

Factors three and four ("Proximity of Products" and ("Likelihood of Bridging the Gap") likewise cut against any likelihood of confusion.  The "Scary Terry" apparel and Easter Unlimited's products were not offered in overlapping markets.  Rozier's clothing was marketed to Rozier fans, while Easter Unlimited markets costumes and novelty-items for holidays.  SUMF ¶¶ 35-36, 42.  And, there is no evidence to indicate that Easter Unlimited intends to move into sports apparel, let alone begin marketing specifically to Rozier fans.

As for factor five ("Actual Confusion"), Easter Unlimited cannot point to a single

instance of a consumer mistakenly believing the "Scary Terry" apparel was affiliated with Easter Unlimited.  Nor can Easter Unlimited point to any survey data indicating that consumers would make such an association.  Thus, this factor cuts overwhelmingly in Rozier's favor.

Factor six ("Good Faith") also cuts in Rozier's favor.  The undisputed record shows that Rozier wanted that mask for his apparel because of his personal affection for the *Scream* movies, which were meaningful to him growing up, not to poach Easter Unlimited's business or good will.  SUMF ¶ 13-16.  Moreover, given the parody context, the fact that Rozier deliberately selected an image that would invoke the mask from *Scream* does not suggest that he "acted with the intent relevant in trademark cases – that is, an intent to capitalize on consumer deception or hitch a free ride on plaintiff's good will."  *Louis Vuitton*, 156 F. Supp. 3d at 443 (citation omitted).  That is because, as explained above, the mask image was invoked in jest or as satire, rather than to exploit its market power.  *See, e.g.*, *id.* at 443 (no bad faith even where seller of canvas tote bags deliberately invoked Louis Vuitton's mark; it was for purpose of satire).

Finally, Easter Unlimited cannot point to any evidence to indicate that factors seven and eight ("Quality of Goods" and "Sophistication of Consumers") cut in its favor.  If anything, factor eight favors Rozier.  Any fan of Rozier who is motivated enough to purchase apparel advertising that fandom can be expected to take care to determine whether the Rozier merchandise being purchased is affiliated with Rozier and not some other brand.

Easter Unlimited cannot meet its burden to show a likelihood of confusion arising out of Rozier's use, and Rozier is entitled to summary judgment on the trademark infringement claims on this additional ground.

### B.   Easter Unlimited Cannot Prevail On Its Claim For Trademark Dilution Claim (Count 6).

Finally, Easter Unlimited likewise cannot prevail on its claim for trademark dilution by blurring.  First, using a mark in the context of parody or satire is not a source of dilution by blurring for the same reason that such a use is not a source of consumer confusion.  That is because "the use of famous marks in parodies causes no loss of distinctiveness, since the success of the use depends upon the continued association of the mark with the plaintiff." *Tommy Hilfiger*, 221 F. Supp. at 422 (granting summary judgment on dilution by blurring based on use of parody of famous mark); *see also Louis Vuitton*, 156 F. Supp. 3d at 438-440 (same).  That applies here.  The "Scary Terry" apparel does nothing to weaken any association of the mask with *Scream*, even if Easter Unlimited did have a protectable interest in that association, which it does not.

Second, even apart from the special considerations that apply when a mark is used in the context of parody or satire, Easter Unlimited cannot prevail on its dilution claim.  Prevailing on such a claim depends, *inter alia*, on the "distinctiveness" the owner's purportedly "famous mark," and the "exclusiveness" of the owner's use of the mark.  *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 111 (2d Cir. 2010) (quoting 15 U.S.C. § 1125(c)(2)(B)(i-iv)); *see also Louis Vuitton*, 156 F. 3d at 433 (dilution claim requires proof of secondary meaning).  As explained above, Easter Unlimited's purported mark is neither distinctive as to Easter Unlimited, nor used exclusively by Easter Unlimited.  Rather, Easter Unlimited licensed the mark for use in *Scream*, and it is associated with that source, not Easter Unlimited.  That defeats any dilution claim.  In addition, "[d]ilution by blurring or tarnishment could possibly occur only if the defendant uses the designation as its own trademark for its own goods or services." 4 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 24.122; *see also Tiffany*, 600 F.3d at 111-12 (same).  In

this case, Rozier used his own name, likeness, and persona as his mark, and only used the "Ghost Face" mask to flesh out his on-court persona.  Thus, Rozier is entitled to summary judgment on the dilution claim.

## CONCLUSION

For the reasons, set forth above Rozier is entitled to summary judgment on each of Easter Unlimited's claims.


Dated:  July 31, 2020                                      Respectfully submitted,

                                                                    */s/ Patrick S. Kabat*                          
                                                                    Patrick S. Kabat, Esq.
                                                                    315 Madison Avenue, 3rd Floor
                                                                    New York, NY 10017
                                                                    Telephone: 646.979.3820
                                                                    patrick@poetsandpatrons.org

                                                                    Paul J. Safier
                                                                    BALLARD SPAHR LLP
                                                                    1735 Market Street, 51st Floor
                                                                    Philadelphia, PA 19103-7599
                                                                    Telephone: 215.988.9146
                                                                    Facsimile: 215.864.8999
                                                                    safierp@ballardspahr.com

                                                                    *Counsel for Defendant Terry Rozier*