**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

EASTER UNLIMITED, INC. d/b/a FUN WORLD,

        Plaintiff,

    -against-

TERRY ROZIER,

        Defendant.

Docket No: 2:18-cv-06637-RRM-ARL

**DECLARATION OF ALAN GELLER IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

ALAN GELLER, pursuant to 28 U.S.C. §1746 hereby states and declares as follows:

1. I am the vice president of EASTER UNLIMITED, INC. d/b/a FUN WORLD, Plaintiff in this action and, as such, have personal knowledge of the facts set forth in this Declaration, and would testify to them in a court of law if required to do so. I make this Declaration in opposition to Defendant's Motion for Summary Judgment.

2. Plaintiff is a domestic business corporation duly organized and existing under the laws of the state of New York, having filed its initial registration in or about April, 1963.

3. Since its formation, Plaintiff has been a designer, manufacturer and supplier of original costumes and masks, holiday items and novelty gifts.

4. Plaintiff designs, manufactures and markets products for Halloween, Easter, Valentine's, St. Patrick's, Christmas and patriotic occasions.

5. Plaintiff is the legal and rightful owner of valuable intellectual property, including its original costumes, masks, holiday items and novelty gifts.

6. Plaintiff's products are original, creative works in which Plaintiff's own protectable intellectual property interests, as is evinced by its ownership of copyright and trademark

registrations for its products.

7. Plaintiff's primary assets are its proprietary costumes, masks, holiday items and novelty gifts, and the rights it owns with respect thereto. Indeed, Plaintiff's business model of developing original costumes, masks, holiday items and novelty gifts is dependent on its ability to protect its exclusive right to market or license such products.

8. Plaintiff has obtained active and valid copyright registrations from the United States Copyright Office (the "USCO") which cover all of Plaintiff's original designs and products.

9. Plaintiff has also obtained active and valid trademark registrations from the United States Patent and Trademark Office (the "USPTO") which cover all of Plaintiff's original designs and marks.

10. Among the original costumes, masks, holiday items and novelty gifts created by Plaintiff is a ghost face mask with shroud (the "*Ghost Face® Mask*"). *A copy of the Ghost Face® Mask is annexed to the Complaint in this action as Exhibit 1.*

11. In or about 1993, Plaintiff applied for copyright registration of the Ghost Face® Mask.

12. The initial registration of the Ghost Face® Mask was approved by the United States Copyright Office (the "*USCO*") on February 23, 1993, under number VA 983 747. *See Exhibit 2 to the Complaint.*

13. The USCO granted a subsequent registration of the Ghost Face® Mask to Plaintiff on June 21, 1999 under registration number VA 552 798. *See id.*

14. In or about 2002, Plaintiff applied for and was granted trademark registration for the Ghost Face® name and logo.

15. A second trademark for the Ghost Face name and logo, including the word itself

was registered in 2011.

16. A third trademark for the Ghost Face name and logo was updated and registered in 2012. *See Dkt. No.* 1-3.

17. The Ghost Face® Mask has been a famous copyright and trademark of Plaintiff's from the time of their initial registrations through today, and is known throughout the world.

18. In or about 1996, Plaintiff was approached by the creators of the popular "slasher film" Scream, who asked to use the Ghost Face® Mask in the movie.

19. After negotiations, Plaintiff agreed to issue a license to Dimension Films to use Ghost Face® in Scream.

20. Scream proved to be a wildly successful box office sensation and subsequently had three sequels.

21. As a result of that success, we granted Dimension Films the rights to use the Ghost Face® mask in in six additional motion pictures, including the Scream sequels, Scary Movie, and Jay and Silent Bob Strike Back.

22. Plaintiff has also granted rights to Spyglass Media Group/Paramount for the use of Ghost Face® in SCREAM 5 to be released in late 2021.

23. As a result of the Scream movies, Plaintiff's Ghost Face® Mask has become widely famous and remains a popular Halloween costume mask.

24. Although Ghost Face® became widely popularized as a result of it being featured in the Scream movies, because Plaintiff has aggressively policed its intellectual property rights and marketing of its products, in the twenty four (24) years since the release of the initial Scream movie, Ghost Face® is known throughout the world known by its trademark as being property owned by Plaintiff.

25. Defendant is a professional basketball player, who currently plays in the National Basketball Association (the "*NBA*") and, at all times relevant to the Complaint, played for the Boston Celtics.

26. Defendant was drafted by the Celtics in the first round of the 2015 NBA draft, and is a self-proclaimed devotee of the Scream franchise.

27. Defendant's initial NBA career was unremarkable and he did not make his first start until January 31, 2018, when injury sidelined his star teammates Kyrie Irving, Marcus Smart and Shane Larkin.

28. Although Defendant and his marketing team had tried to develop a "brand" for him by giving him nicknames such as "Tito" and "T-Ro" since, as Defendant states in his declaration, "all the greatest basketball players had nicknames," citing legends such as Michael "Air" Jordan, Earvin "Magic" Johnson, and Karl "the Mailman" Malone.

29. Unfortunately for Defendant, his repeated efforts to brand himself with his own nickname gained no traction. That is, until Defendant happened upon a chance to capitalize on Plaintiff's goodwill.

30. Following unexpected (yet impressive) performances in the 2018 NBA playoffs, fans of the Boston Celtics—and the Boston media—began to refer to Defendant as "Scary Terry." Unlike Defendant's prior efforts to brand himself, the nickname "Scary Terry" appeared to stick.

31. Seizing the moment, and without regard to Plaintiff's intellectual property rights, Defendant decided that "Scary Terry" needed an identity.

32. As Defendant was already seeking to develop a line of wearing apparel associated with his (then relatively unknown) brand, his marketing team suggested developing a line of t-shirts, "hoodies" and other apparel featuring "Scary Terry." Defendant agreed.

33. As Defendant's motion states, the first rendition of "Scary Terry" proposed by his marketing team featured Defendant wearing a hockey mask, such as that worn by the killer in the Friday the 13th movies.

34. While Defendant liked the idea of "Scary Terry" being a "killer," he killed the idea of "Scary Terry" being depicted as Jason from the Friday the 13th movies. Instead, Defendant insisted on using Plaintiff's Ghost Face® mask, insofar as Ghost Face® was the face of the faceless killer featured in Scream, Defendant's favorite horror movie.

35. As Defendant states in his declaration, he and his "team" initially printed approximately 500 "Scary Terry" t-shirts and hoodies, which featured Defendant in his basketball uniform, wearing Plaintiff's Ghost Face® mask.

36. Finding that the initial run of "Scary Terry" merchandize sold out almost immediately, Defendant authorized others to create, manufacture and sell additional merchandise featuring Plaintiff's Ghost Face® mask.

37. Plaintiff commenced this action upon its discovery that Defendant had appropriated its Ghost Face® mask as the face of "Scary Terry" without license or permission from Plaintiff.

38. It is my understanding that Defendant is asking this Court to grant him summary judgment on essentially three grounds. First, Defendant argues that "none of the media reports stated that the 'Scary Terry' clothing was associated with Scream or with Plaintiff. Second, Defendant argues that Plaintiff is not the creator or owner of Ghost Face®. Third, Defendant argues that Plaintiff has not used Ghost Face® as a design mark of its brand. Each of Defendant's arguments must fail.

39. As to the first point, the very media reports to which Defendant refers quote Defendant as saying "**I love scary movies [and] Scream is my favorite**. The way he talks on the

phone, talks stuff and all that. [Then] the season plays out, we play Indiana Pacers and I got that last steal and dunk. People started calling me Scary Terry around that time. I was in L.A. and one of the guys in my agency who does marketing sent me shirts. It had the Jason mask on there. And I was like, "**We need to get the Scream mask on there**." Then, around the time the playoffs, we started selling them out.[1]" (emphases added).

40. Elsewhere, Defendant was quoted as saying "I feel like the scary movies nowadays is not like they used to be," Rozier said. "[The Scream mask] was just my favorite. Then people in Boston started doing the Scary Terry thing, so they started using the Jason mask and I'm like, '**Nah, we're using Scream**.' " Dkt. No. 1-4 (emphasis added).

41. To this end, Defendant has admitted that he purported to authorize Barstool Sports, I Love Boston Sports, and ISlide USA to sell merchandise featuring the "Scary Terry" image, but did so without license or authorization from Plaintiff.

42. Defendant's intention to use the "Scream mask" aside, a simple side-by-side comparison shows that the mask worn by "Scary Terry" is clearly Ghost Face®.

43. As to the second point, Plaintiff is clearly the creator of Ghost Face®.

44. As was stated in Plaintiff's amended responses to Defendant's Interrogatories, in or about 1991, I hired sculptor Fok Lee ("*Lee*") in Hong Kong as a work-for-hire artist on behalf of Plaintiff to create new masks in conjunction with myself, including Halloween masks, to add to Plaintiff's line of products.

45. All of the products created by Lee pursuant to our agreement were to be designed exclusively for Plaintiff.

46. Among the masks created by Lee for Plaintiff was the one which would eventually

---

[1] *Id.* citing https://www.gq.com/story/terry-rozier-tunnel-style ("How'd the Scary Terry thing come together?).

become known as Ghost Face®.

47. When I met with Lee in Hong Kong in 1991, he presented me with the sculpture of a mask that would eventually become Ghost Face®, however, I asked that certain changes be made to the sculpture.

48. Over the course of approximately two weeks, the sculpture was revised several times, until I came to finally decide on the design that would become Ghost Face®.

49. The Ghost Face® Mask was an original design created by Lee, Plaintiff's work-for-hire employee, and myself.

50. Contrary to Defendant's contention, Ghost Face® was not created by Tony Gardner or Alterian Studios.

51. As an initial matter, I do not know who Tony Gardner is.

52. While Gardner claims to have created a mask which purportedly bears a resemblance to Ghost Face® in or about 1990 (referred to in Defendant's motion as "Wailer"), I have never seen "Wailer" before this motion.

53. Similarly, while Gardner claims that Plaintiff was a "sponsor" of the "biggest national expositions" between 1991 and 1993, that statement is not true. For one, I do not understand the meaning of the word "sponsor" as Defendant uses it. Further, without knowing which particular shows Defendant is referring to, Plaintiff is unable to determine if it had any presence of any kind at the particular show(s) to which Defendant is referring.

54. To the extent that Gardner alleges that Plaintiff had employees at "each national event" in 1991, "at least one of which [Gardner] attended," I cannot speak to this as I do not know which event Gardner purports to have attended. Further, based on the information available to me, I cannot confirm that Plaintiff attended any "national events" in 1991.

55. I find it curious that Gardner can state that 'as far as he knows, no Easter employee visited his booth,' while simultaneously stating that an employee (or employees) of Easter was (were) at this unspecified event.

56. I find it equally curious—if not more so—that Gardner now claims to be the author of Ghost Face® when he did not object to Plaintiff's application for copyright or trademark, or when he—as a person professing to be a pioneer (and now mainstay of) the mask, makeup and special-effects trade of the film industry.

57. In or about 2018, I became aware that Defendant began selling merchandise using Plaintiff's Ghost Face mask for his own benefit and gain.

58. I also dispute Defendant's allegation that Plaintiff "is not claiming any trademark rights in the 'product configuration' of the Ghost Face® mask" itself, insofar as I do not understand what Defendant is alleging in this regard.

59. Plaintiff is seeking to protect its rights in all of its intellectual property in this action.

60. The merchandise sold by Defendant featuring Plaintiff's Ghost Face® mask includes but is not limited to, t-shirts, hoodies, and other items of apparel.

61. Defendant's use of Plaintiff's Ghost Face® mask on wearing apparel is the type of use for which Plaintiff would require authorizations and/or a license agreement from Plaintiff.

62. Defendant's use of Plaintiff's Ghost Face® image is the type of use for which Plaintiff would require a license, as Plaintiff also licenses its intellectual property for use on items such as t-shirts bearing its trademarked Ghost Face image.

63. Plaintiff did not give Defendant a license to use Ghost Face® on any product.

64. Plaintiff did not and does not authorize Defendant's use of Ghost Face®.

65. Defendant's usage of Plaintiff's registered trademark for its Ghost Face® mask on

his merchandise is the most substantial part Plaintiff's trademarked image.

66. Defendant's "Scary Terry" products are substantially similar to products sold by Plaintiff, to the extent that they utilize the entirety of Plaintiff's trademarked Ghost Face® image.

67. Defendant's claim that his use of Plaintiff's intellectual property was purportedly a "fair use" is patently false.

68. Plaintiff's copyright registration covers the Ghost Face® mask. A mask is meant to be worn by a person. The fact that the image of "Scary Terry" is a drawing of Defendant wearing Plaintiff's Ghost Face® mask—rather than a picture of himself wearing Ghost Face® mask—should not change this inquiry.

69. That is particularly so, insofar as Plaintiff licenses its Ghost Face® mask and/or image for use on wearing apparel—the precise use made by Defendant here.

70. Plaintiff's Ghost Face® mask is an original design for which Plaintiff holds both copyright and trademark rights.

71. Defendant used the entirety of Plaintiff's Ghost Face® mask and image in creating the face of his imaginary "Scary Terry" persona.

72. Defendant's use of Plaintiff's Ghost Face® mask was not "transformative" in any way. To the contrary, Ghost Face® is most known for being a faceless killer. That is precisely the imagery Defendant intended to convey by creating images of himself wearing the Ghost Face® mask.

73. If the type of use of Ghost Face® made by Defendant here is permitted, it will dilute—if not eliminate—Plaintiff's ability to control, market and license its intellectual property.

74. Had Defendant approached Plaintiff prior to his theft of our property, Plaintiff would not have approved the use of Ghost Face® made by Defendant.

75. The same may be said for Defendant's theft of Plaintiff's Ghost Face® trademark.

76. While the trademark covers the Ghost Face® image, together with a word mark for Ghost Face®, it is the image that is the most substantial portion of the mark.

77. The words "Ghost Face" alone would have no meaning without the mask and/or image.

78. Defendant appropriated the single most identifying feature of Plaintiff's trademark when unilaterally determining that Ghost Face® should be the face of "Scary Terry."

Dated: Carle Place, NY
August 19, 2020

_____
Alan Geller