UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

--------------------------------X

EASTER UNLIMITED, INC. d/b/a FUN
WORLD,

              Plaintiff,          **MEMORANDUM & ORDER**
                                    18-CV-06637 (KAM)

      -against-

TERRY ROZIER,

              Defendant.

--------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

        Plaintiff Easter Unlimited, Inc. d/b/a Fun World ("Plaintiff" or "Easter") commenced this action alleging that Defendant Terry Rozier ("Defendant" or "Mr. Rozier") unlawfully produced merchandise bearing a design in violation of Plaintiff's copyright and trademark rights.  Plaintiff asserts six claims pursuant to the Copyright Act, 17 U.S.C. § 501 *et seq.*, and the Lanham Act, 15 U.S.C. § 1114, including the following: direct copyright infringement (Count I), contributory copyright infringement (Count II), vicarious copyright infringement (Count III), trademark infringement (Count IV), federal trademark counterfeiting (Count V), and dilution by blurring (Count VI).  (*See generally* ECF No. 13, Amended Complaint ("Am. Compl.").)  Plaintiff seeks statutory damages under the Copyright Act, actual damages under the Lanham Act,

1

permanent injunctive relief, and attorneys' fees and costs.
(*Id.* at 11-12.)

Pending before this Court are a motion for partial
summary judgment filed by Plaintiff and a cross-motion for
summary judgment filed by Defendant.  Plaintiff moves for
partial summary judgment on its claims against Defendant as to
Counts II-IV for contributory copyright infringement, vicarious
copyright infringement, and trademark infringement.  (*See* ECF
No. 49-5, Memorandum of Law in Support of Plaintiff's Motion for
Partial Summary Judgment ("Pl. Summ. J. Mem.").)  Defendant
moves for summary judgment on all six/ of Plaintiff's claims.
(*See* ECF No. 52-22, Memorandum of Law in Support of Defendant's
Motion for Summary Judgment ("Def. Summ. J. Mem.").)  For the
reasons set forth below, Plaintiff's motion for partial summary
judgment is DENIED in its entirety.  Defendant's cross-motion
for summary judgment is GRANTED.

## BACKGROUND

I.  **Factual Background[1]**

 **A. The Parties**

Plaintiff Easter Unlimited, Inc., is a business that
designs, manufactures, and supplies costumes, masks, holiday

---

[1] The following facts are taken primarily from the parties' respective
Statements of Material Facts pursuant to Local Civil Rule 56.1 ("56.1
statement"), and have not been specifically or directly disputed with
admissible evidence unless otherwise noted.

items, and novelty gifts.  (Pl. 56.1 Statement ("56.1") ¶ 2.)

Among these products is a ghost face mask with shroud ("Ghost

Face Mask") for which Easter Unlimited holds a copyright

registration, effective as of February 23, 1993.  (*Id.* at ¶ 19;

ECF No. 14-1, Am. Compl. Ex. 2, Certificate of Registration VA

552 798.)  The Certificate of Registration states the "nature of

this work" as "sculpture," and the title as "ghost mask with

shroud" and "Glow in Dark & Fluorescent – Item #9206/9207."

(ECF No. 14-1, Am. Compl. Ex. 2, Certificate of Registration VA

552 798, p. 2.)  The certificate of registration for the

supplementary registration is dated June 21, 1999, and states

the title of the work is "'Ghost Face' Mask with Shroud."  (*Id.*

at p. 4.)  The parties dispute the identity of the original

author the Ghost Face Mask; Plaintiff presents a declaration

stating that Hong Kong-based sculptor Fok Lee created the mask

for Easter Unlimited as part of a work-for-hire relationship,

while Defendant presents a declaration stating that Alterian

Studios originally created the mask called the "Wailer" in early

1991.  (*See* ECF No. 49-2, Declaration of Alan Geller ("Geller

Decl.") ¶¶ 14-18; *see also* ECF No. 52-2, Gardner Decl. ¶¶ 17-

22.)

Easter Unlimited also holds a trademark registration

under registration number 4,256.208, most recently updated and

registered as of December 11, 2012.  (*See* Pl. 56.1 at ¶¶ 30-31;

*see also* ECF No. 14-2, Am. Compl., Ex. 3; Geller Decl. ¶¶ 9-10.)

The United States Patent and Trademark Office ("USPTO")

describes the trademark as follows:

> The mark consists of a stylized
> representation of a ghost outlined in red
> with a white face, black eyes, nose and
> mouth, a black cloak and holding a black and
> gray knife in its left hand. The stylized
> wording "Ghost Face" appears in shades of
> gray to white below the ghost design with a
> red drop hanging off the letter "F" in
> "Face". The Black rectangle represents
> background only and is not part of the mark.

(ECF No. 14-2, Am. Compl. Ex. 3, USPTO Reg. No. 4,256,208, at p.

1.) The mark in the USPTO registration is depicted below:



(*Id.*)

Defendant Terry Rozier is a professional basketball

player in the National Basketball Association ("NBA") who

currently plays for the Charlotte Hornets.  (Def. 56.1 ¶ 1.)

Mr. Rozier began his NBA career when he was drafted in the first

round of the 2015 NBA draft by the Boston Celtics.  (*Id*. at ¶

2.)  In 2018, Mr. Rozier, a backup guard, filled in when

Celtics' star point guard Kyrie Irving ("Mr. Irving") was

injured; this was Mr. Rozier's first start after appearing in more than 160 regular season games.  (Def. 56.1 ¶ 3; Pl. 56.1 ¶ 33.)  Mr. Rozier became the first NBA player since the 1970-71 season to earn a triple-double in his first career start.  (Pl. 56.1 at ¶ 34.)

**B. Events Giving Rise to the Complaint**

Plaintiff alleges that the Ghost Face Mask for which it holds a copyright registration, appears as follows:



(ECF No. 1-1, Compl., Ex. 1.)[2]  In or about 1996, Easter Unlimited granted Dimension Films a license to use the Ghost Face Mask in the 1996 film *Scream*.  (Pl. 56.1 at ¶¶ 23-24.) *Scream* was "a wildly successful box office sensation," and the

---

[2] Plaintiff submitted Exhibit 1 as part of its original Complaint.  (ECF No. 1, Compl.)  Plaintiff subsequently filed an Amended Complaint, and though it continued to reference this same Exhibit 1, Plaintiff failed to attach Exhibit 1 to its Amended Complaint.  (*See* ECF No. 13, Am. Compl., at ¶ 18 ("Plaintiff is the original designer of the Ghost Face Mask, as set forth in *Exhibit '1'* which is annexed hereto and incorporated in its entirety herein.")

success of the film led to three sequels. (*Id.* at ¶ 25.) The Ghost Face Mask became "widely famous" as a result of its appearance in the *Scream* movies. (*Id.* at ¶ 26.)

In 2018, after filling in for Mr. Irving, Mr. Rozier acquired a reputation with Celtics fans and around the league as a "dangerous scorer" and "fearless shooter," and Celtics fans as well as sports media began calling him "Scary Terry." (Pl. 56.1 at ¶ 33; Def. 56.1 at ¶¶ 4-5.) The nickname was intended to humorously invoke the fear that Mr. Rozier's "dangerous" ability to score supposedly instilled in his opponents. (Def. 56.1 at ¶ 6.) Defendant also stated in his declaration in support of his cross-motion for summary judgment that by accepting the "Scary Terry" nickname, he wanted to engage with his fans and share personal aspects of himself, like "[his] love for scary movies, and what they meant for [his] own story." (ECF No. 52-12, Decl. of Terry Rozier ("Rozier Decl.") at ¶ 6.)

Defendant adopted the Scary Terry persona, and decided to market a line of t-shirts and hooded sweatshirts to celebrate the persona and capitalize on his growing celebrity status. (Def. 56.1 at ¶ 7.) Defendant determined that the clothing line would feature the name "Scary Terry" and a cartoon depiction of Mr. Rozier wearing a mask associated with a serial killer from popular horror. (*Id.* at 8.) Mr. Rozier selected a "serial killer mask" to humorously associate his Scary Terry persona

with the common practice of "referring to professional athletes—especially hot-shooting point guards—as 'killers.'" (*Id*. at ¶ 9.) In order to underscore the humor implicit in the Scary Terry persona, Mr. Rozier and his management team wanted to have the designs reflect a children's cartoon rather than an actually scary or sinister image. (*Id*. at ¶ 10.) Defendant and his management team hired Glen Infante, a popular mural artist, to draw the designs for the clothing, and the original design depicted a cartoon drawing of Mr. Rozier in his Celtics jersey wearing a hockey mask like the villain "Jason" from the horror movie *Friday the 13th*. (*Id*. at ¶¶ 11-13.) In response to seeing the "Jason" design, Mr. Rozier has been quoted as saying, "We need to get the *Scream* mask on there," and "Nah, we're using *Scream*." (Pl. 56.1 ¶¶ 37-38.)

Mr. Rozier subsequently specifically asked for a version of his cartoon character wearing the mask from the movie *Scream*. (Def. 56.1 at 14; Pl. 56.1 ¶¶ 37-38.) Mr. Rozier made this request for sentimental reasons, including the affection he had for the film as a child, as "its mix of violence and humor provided solace and escapism in a childhood surrounded by violence." (Def. 56.1 ¶¶ 15-16.) The "Scary Terry" clothing line incorporated Mr. Rozier's suggestion, and the design at issue in this lawsuit was created: a cartoon image of Rozier in his Celtics uniform wearing a *Scream* mask over the words "Scary

Terry." (Def. 56.1 at ¶ 19.) Mr. Rozier posted a picture of
himself wearing the t-shirt design at issue in this lawsuit to
his Instagram account on February 15, 2018, depicted immediately
below.



(*Id.* at 19.)

　　　　Initially, Mr. Rozier had approximately 500 Scary
Terry shirts and hoodies made, including an undisclosed number
featuring the design with him wearing the *Scream* mask, and
marketed them through his social media and a dedicated website.
(Def. 56.1 ¶¶ 20-21.) Thereafter, Mr. Rozier enjoyed continued
success on the court during the 2017-2018 season and helped lead
the Celtics on a surprising playoff run, which in turn led to a
surge in popularity for the Scary Terry persona. (*Id.* at ¶ 23.)
Mr. Rozier had more Scary Terry apparel produced in order to

capitalize on this surge in popularity. (*Id*. at ¶ 24.) Both the Scary Terry phenomenon and clothing line received coverage in multiple media publications, and Mr. Rozier authorized Barstool Sports, I Love Boston Sports, and ISlide USA to sell Scary Terry merchandise. (*Id*. at ¶¶ 24-31.) The Scary Terry clothing was not affiliated with the movie *Scream*, and was not marketed as affiliated with the movie. (*Id*. at ¶ 37.) The Scary Terry clothing was also not marketed as being affiliated with or authorized by Easter Unlimited. (*Id*. at ¶ 38.) Plaintiff Easter Unlimited did not authorize any use by Defendant Mr. Rozier of the Ghost Face mask. (Pl. 56.1 at ¶ 42.) Mr. Rozier received approximately $150,000 in gross sales revenue from the sale of the Scary Terry clothing. (Def. 56.1 at ¶ 40.)

## II. **Procedural History**

Plaintiff filed the original complaint in the present action on November 20, 2018. (ECF No. 1, Compl.) Plaintiff filed an amended complaint on March 14, 2019. (ECF No. 13, Am. Compl.) Defendant Barstool Sports, Inc., was dismissed as a party on September 19, 2019, making Mr. Rozier the sole Defendant. (Sept. 19, 2019, Docket Order.) Discovery was completed and closed in this case as of June 2, 2020. (June 2, 2020, Scheduling Order.)

Plaintiff filed a motion for partial summary judgment, including a Rule 56.1 Statement. (*See* ECF No. 49, Pl. Notice of Summ. J. Mot.; *see also* ECF No. 49-1, Pl. 56.1.) Defendant filed a memorandum in opposition to Plaintiff's motion for summary judgment, including a counter-Rule 56.1 Statement. (*See* ECF No. 50, Def. Mem. in Opp.; *see also* ECF No. 50-1, Def. Resp. 56.1.) Plaintiff filed a reply in support of its motion for summary judgment. (*See* ECF No. 51, Pl. Reply in Supp.) Defendant filed a cross-motion for summary judgment on all six counts alleged by Plaintiff, and filed a separate Rule 56.1 Statement along with his cross-motion. (*See* ECF No. 52, Def. Notice of Summ J. Mot.; *see also* ECF No. 52-1, Def. 56.1.) Plaintiff filed a response in opposition to Defendant's motion for summary judgment, including a counter-Rule 56.1 Statement. (*See* ECF No. 53, Pl. Resp. in Opp.; *see also* ECF No. 53-1, Pl. Resp. 56.1.) Finally, Defendant filed a reply in support of his motion for summary judgment, including a response to Plaintiff's counter-Rule 56.1 Statement. (*See* ECF No. 54, Def. Reply in Supp.; *see also* ECF No. 54-1, Def. Reply to Pl. Resp. 56.1) The parties' fully briefed summary judgment motions were deemed filed as of September 4, 2020, by court order. (Sept. 8, 2020, Order.) On July 6, 2021, this case was reassigned to the undersigned judge.

## III. Discovery Issues Raised by Parties

As a preliminary matter, the discovery issues raised
by the parties are not timely or properly before the Court.
Discovery has been closed since June 2, 2020. Defendant now
disputes whether Plaintiff may properly present evidence in the
summary judgment record based on Plaintiff's failure to provide
the evidence in response to Defendant's discovery requests.
Defendant filed a motion to compel discovery responses (*see* ECF
No. 34, Def. Letter Mot. to Compel), which Plaintiff opposed
(*see* ECF No. 35, Pl. Resp. to Def. Letter Mot. to Compel), and
which was denied without prejudice to renew on February 13,
2020. (*See* ECF No. 36, Feb. 13, 2020, Order.) Defendant had an
opportunity to raise any remaining discovery issues in the
nearly four months that followed the denial of its initial
motion to compel before the close of discovery June 2, 2020.
Defendant attempted to confer with Plaintiff's counsel, who
failed to do so. (*See* ECF No. 52-20, Declaration of Patrick S.
Kabat ("Kabat Decl."), at ¶¶ 4-13.) Defendant requested, but
was not provided, documents of Plaintiff's authorship of the
Ghost Face Mask or documents of Plaintiff's use of the
Plaintiff's registered mark in relation to Plaintiff's brand.
Thus, Defendant asserts that Plaintiff should be precluded from
using related evidence to defeat summary judgment because of

Plaintiff's alleged wholesale nondisclosure during discovery. (*See* Def. Memo. in Supp. at pp. 9-10.)

Defense counsel's declaration (*see* ECF No. 52-20, Kabat Decl. at ¶¶ 4-13) asserts that Plaintiff refused to meet and confer as to the parties' discovery disputes, including Plaintiff's failure to provide discovery responses, including documents to the Defendant, and that Plaintiff failed to timely provide requested documents, constituting a violation of discovery rules pursuant to Federal Rule of Civil Procedure 37. *See Charles v. Cty. of Nassau*, 116 F. Supp. 3d 107, 121 (E.D.N.Y. 2015) (citing *Kam Hing Enters., Inc. v. Wal-Mart Stores, Inc.*, 359 Fed. Appx. 235, 237-38 (2d Cir. 2010) ("Failure to timely produce documents during the discovery period is a violation of discovery rules, subject to sanctions pursuant to Rule 37."). Under Rule 37, "if a party fails to provide information [...] the party may not use that information or witness to 'supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless.'" *Charles*, 116 F. Supp. 3d at 120-21 (citing Fed. R. Civ. P. 37; *Matheson v. Kitchen*, 515 Fed. Appx. 21, 23 (2d Cir. 2013) (internal citations omitted)). District courts have discretion to impose sanctions other than preclusion for discovery violations under Rule 37. *See Charles*, 116 F. Supp. 3d at 121 (internal citations omitted).

Though Defendant should have sought further relief from the Magistrate Judge, the Plaintiff should not benefit from withholding evidence until summary judgment. The Court, in its discretion, will nonetheless consider the full extent of the submissions made by the parties. Plaintiff's registrations are a matter of public record and are not in dispute as registered copyrights and trademarks. *See Hutson v. Notorious B.I.G., LLC*, No. 14-cv-2307 (RJS), 2015 WL 9450623, at *3 (S.D.N.Y. Dec. 22, 2015) (citing *Island Software & Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (noting that a court can take judicial notice of a federal copyright registration, and taking judicial notice of trademark registrations published in Patent and Trademark Office's registry)) (internal citations omitted).

The Court also rejects Plaintiff's argument that the testimony of Tony Gardner ("Gardner Declaration") should be precluded under Federal Rule of Civil Procedure 37(c)(1) because Defendant's non-disclosure under Rule 26(a)(1) was an attempt "to conduct a trial by ambush." (*See* ECF No. 53, Response in Opposition for Summary Judgment filed by Terry Rozier ("Pl. Resp.") at 12-13.) Rule 26(a)(1) requires parties to disclose the name of "each individual likely to have discoverable information—along with the subjects of that information—that the

disclosing party may use to support its claims or defenses."

Fed. R. Civ. P. 26(a)(1). Rule 37(c)(1) states that:

> [a] party that without substantial
> justification fails to disclose information
> required by Rule 26(a) . . . is not, unless
> such failure is harmless, permitted to use
> as evidence at a trial, at a hearing, or on
> a motion any witness or information not so
> disclosed.

Fed. R. Civ. P. 37(c)(1) (emphasis added). "Failure to comply

with the mandate of [Rule 26] is harmless when there is no

prejudice to the party entitled to the disclosure." *Aboeid v.*

*Saudi Arabian Airlines Corp.*, No. 10-cv-2518 (SJ), 2011 WL

5117733, at *2 (E.D.N.Y. Sept. 6, 2011) (internal quotation

omitted); *see also Izzo v. ING Life Ins. & Annuity Co.*, 235

F.R.D. 177, 186 (E.D.N.Y. 2005) (quoting *Update Art, Inc. v.*

*Modiin Publishing, Ltd*., 843 F.2d 67, 71 (2d Cir. 1988))

("[p]reclusion of evidence ... [is a] harsh remedy and should be

imposed only in rare situations[.]").

     The Court finds Defendant's nondisclosure was

harmless. Defendant's discovery requests put Plaintiff on

notice of the existence of both Tony Gardner ("Mr. Gardner") and

his company Alterian Studios ("Alterian"), as well as

Defendant's intent to argue that Plaintiff did not hold a valid

copyright based on Mr. Gardner's and Alterian's prior ownership.

In Defendant's initial request for production of documents on

October 22, 2019, Defendant asked for "all documents and

communications that refer or relate to any third party
questioning, challenging, or addressing your ownership or the
viability of any rights claimed by you in the Image, the Mask or
Your IP . . ." and further explicitly named Mr. Gardner and
Alterian as third parties.  (ECF No. 34-2, Motion to Compel
Discovery Responses, Ex. B at ¶ 5.)  Defendants then asked
Plaintiff for the following:

> All documents, communications, materials and
> records that refer or relate to your
> awareness, attendance, or participation in
> trade shows between 1989 and 1991, including
> any trade show or public exhibition at which
> Alterian Studios, Inc. or the Alterian Ghost
> Factory attended, participated, or exhibited
> the Ghost Maker line of products.

(*Id.*)  Defendant's Sixth Interrogatory then requested Plaintiff
"[l]ist, describe, and explain any responses made by [Plaintiff]
or its employees to any and all public statements denying its
original authorship of the Mask, or denying Alan Geller's
original authorship of the Mask, including statements made by
Tony Gardner . . ."  (ECF No. 34-5, Ex. E, at p. 7.)  Based on
the foregoing, the Court rejects Plaintiff's argument that
"Gardner's first appearance in this case was as a declarant in
support of Defendant's motion for summary judgment."  (ECF No.
53-3, Decl. of Craig B. Sanders in Opp. ("Sanders Decl.") at ¶
11.)  The Court finds that Plaintiff had notice of the potential

relevance of Mr. Gardner and that nondisclosure was harmless and, therefore, declines to preclude the Gardner Declaration.

**LEGAL STANDARD**

## I. Summary Judgment Standard

"Summary judgment is appropriate where there is no genuine dispute as to any material fact and the record as a whole indicates that no rational factfinder could find in favor of the non-moving party." *Graves v. Finch Pruyn & Co.,* 353 F. App'x 558, 560 (2d Cir. 2009) (internal citation omitted). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir. 2007) (quotation marks omitted). "A fact is material when it might affect the outcome of the suit under governing law." *Id.* (internal quotation marks omitted). Moreover, an issue of fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

"In order to defeat a motion for summary judgment supported by proof of facts that would entitle the movant to judgment as a matter of law, the nonmoving party is required

under Rule 56(e) to set forth specific facts showing that there is a genuine issue of material fact to be tried." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993) (citations omitted). "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment." *Anderson,* 477 U.S. at 248. The nonmoving party may not, however, "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." *Ying Jing Gan*, 996 F.2d at 532–33 (citations and quotation marks omitted).

The standard for summary judgment remains the same when cross motions for summary judgment are being considered. *See Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001); *Eschmann v. White Plains Crane Serv., Inc.*, No. 11-cv-5881, 2014 WL 1224247, at *3 (E.D.N.Y. Mar. 24, 2014). The court must examine each party's motion independently, and "in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 115 (citation omitted).

## DISCUSSION

As noted, Plaintiff moves for partial summary judgment on three of its claims (Counts II-IV), while Defendant moves for summary judgment on all six of Plaintiff's claims (Counts I-VI).

Accordingly, where appropriate, the Court will draw inferences in Plaintiff's favor with respect to Defendant's motion, and draw inferences in Defendant's favor with respect to Plaintiff's motion.

## I. Plaintiff's Copyright Claims

Plaintiff contends that Defendant committed direct, contributory, and vicarious copyright infringement (Counts I-III) when, allegedly, "Defendants, without permission or authorization from Plaintiff, actively copied, stored, modified, and/or displayed Plaintiff's intellectual property and engaged in this misconduct knowingly and in violation of the United States copyright . . . laws." (Am. Compl. at ¶ 6.)

To establish copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (internal citation omitted). Copyright infringement is a strict liability offense, meaning "intent or knowledge is not an element of infringement." *Fitzgerald Publ'g. Co. v. Baylor Publ'g. Co.*, 807 F.2d 1110, 1113 (2d Cir. 1986). Further, it is well-established that one may be vicariously liable for copyright infringement despite not having directly committed an infringing act. For example, a person who has promoted or induced the infringing acts of the performer has been held

jointly and severally liable as a 'vicarious' infringer, even though he has no actual knowledge that copyright monopoly is being impaired." *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1161-62 (2d Cir. 1971) (citing *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304 (2d Cir. 1963)). Similarly, with respect to contributory copyright infringement, "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Faulkner v. Nat'l Geographic Enterprises Inc.*, 409 F.3d 26, 40 (2d Cir. 2005) (internal citation and footnote omitted).

**A. Plaintiff's Ownership of a Valid Copyright**

Plaintiff presented evidence that it holds a copyright registration certificate for the Ghost Face Mask under registration number VA 983 747. (Pl. 56.1 at ¶ 20.) Defendant argues that Plaintiff does not, in fact, own any valid copyrights in the Ghost Face Mask, and argues that Plaintiff is not the original author of the mask, as Plaintiff copied the original design from Alterian Studios. (*See* ECF No. 50, Def. Mem. in Opp., at pp. 4-5.)

The "production of a certificate of registration made before or within five years after first publication of the work constitutes prima facie evidence of the validity of the

copyright[,]" and "[t]he evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." *See* 17 U.S.C.A. § 410 (c); *see also Urbont v. Sony Music Ent.*, 831 F.3d 80, 88–89 (2d Cir. 2016) (quoting 17 U.S.C. § 410(c)). Even though, "[a] certificate of copyright registration is prima facie evidence of ownership of a valid copyright [...] the alleged infringer may rebut that presumption." *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012) (internal citations omitted); *see also Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 166 (2d Cir. 2003) (internal quotation marks and citation omitted) ("[A] certificate of registration creates no irrebuttable presumption of copyright validity," and "where other evidence in the record casts doubt on the question, validity will not be assumed."); *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir.1997) (noting the presumption of validity may be rebutted by evidence that clearly demonstrates that plaintiff's design lacks originality). Here, Plaintiff filed with the Court copies of its copyright registration and its supplementary copyright registration for the Ghost Face Mask. (*See* ECF No. 14-1, Am. Compl. Ex. 2, Certificate of Registration VA 552 798.) The initial copyright registration states that the first publication of the work was December 4, 1991, and that the registration date was February

23, 1993, which constitutes "registration made before or within five years after first publication of the work." (*See* ECF No. 14-1, Am. Compl. Exhibit 2, Certificate of Registration VA 552 798, p. 2); *see also* 17 U.S.C. § 410(c).[3] Thus, absent evidence to the contrary, the court will presume Plaintiff's ownership of and the validity of the copyright.

Plaintiff's proffer of its certificate of copyright registration shifts the burden of overcoming the presumption of validity of the copyright to Defendant, where the burden remains unless the presumption is rebutted. *See Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985); *see also Fonar Corp.*, 105 F.3d at 104 (quoting *Durham Indus., Inc. v. Tomy Corp.,* 630 F.2d 905, 908 (2d Cir. 1980)) ("Generally speaking, the presumption of validity may be rebutted '[w]here other evidence in the record casts doubt on the question.'"). Defendant attempts to meet this burden by arguing that the mask in question was originally created by Mr. Gardner and Alterian, and not by Easter Unlimited. (*See* ECF No. 50, Def. Mem. in Opp., at pp. 4-5; ECF No. 52-22, Def. Summ. J. Mem., at pp. 7-8.) Plaintiff primarily opposes Defendant's argument regarding

---

[3] The original registration provides the title of the work as "ghost mask with shroud" and "Glow in Dark & Fluorescent – Item #9206/9207." (ECF No. 14-1, Am. Compl. Ex. 2, Certificate of Registration VA 552 798, p. 2.) The certificate of registration for the supplementary registration is dated June 21, 1999, and clarifies the title of the originally registered work by removing references to "glow in the dark" and "fluorescent," so that the new title is simply: "'Ghost Face' Mask with Shroud." (*Id.* at p. 4.)

Mr. Gardner and Alterian by asserting that the Court should not consider the Gardner Declaration because Gardner was an undisclosed witness. For the reasons discussed *supra*, the Court declines to preclude consideration of the Gardner Declaration.

As a threshold matter, Mr. Gardner, a third party to this case, would be time-barred from challenging Plaintiff's copyright interests under the applicable statute of limitations, and Defendant cannot now take refuge in Gardner's time-barred position as to any rights Gardner may have once been able to assert. *See* 17 U.S.C. § 507(b) (the Copyright Act of 1976 provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."). A cause of action accrues when a plaintiff knows or has reason to know of the injury upon which the claim is premised. *Merch. v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996) (citing *Stone v. Williams,* 970 F.2d 1043, 1048 (2d Cir.1992)); *see also Latin Am. Music Co. v. Spanish Broad. Sys., Inc.*, 738 F. App'x 722 (2d Cir. 2018) (quoting *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) (A claim of ownership accrues "only once, when a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right[.]") (internal alterations omitted).

The Gardner Declaration concludes that Mr. Gardner was aware that the Ghost Face Mask appeared in *Scream* potentially as

early as 1996. (*See* ECF No. 52-2, Gardner Decl. at ¶ 33.) Although Mr. Gardner says that he only later learned (without specificity as to exactly when) that Easter Unlimited had licensed the Ghost Face Mask used in *Scream*, he confirms that he knew about it at least by 2003, when a United Kingdom solicitor, in the course of responding to a separate copyright action by Easter Unlimited, asked Mr. Gardner if he made the mask first. (*Id.* at ¶¶ 33, 39.) Moreover, Mr. Gardner expressly confirmed that he never brought an action or otherwise sought to assert his intellectual property rights against Easter Unlimited, stating that he "was too busy with original film projects to worry about an industry [he'd] left." (*Id.* at ¶ 36.) Whether it has now been twenty-five years, eighteen years, or somewhere in between, since Mr. Gardner first knew or had reason to know Easter Unlimited was licensing what allegedly was Mr. Gardner's mask, far more than the relevant three-year statutory period has elapsed. Mr. Gardner is time-barred from asserting a claim under the Copyright Act against Plaintiff, and Defendant may not rely on this time-barred theory to defeat the presumption of Plaintiff's copyright validity. *See Complex Sys., Inc. v. ABN Ambro Bank N.V.*, 979 F. Supp. 2d 456, 462 (S.D.N.Y. 2013) (concluding that whether a third party that Defendant relied upon to contest the validity of Plaintiff's copyright "could have once, long ago, asserted ownership rights . . . is now an

irrelevant detour: [the third party] did not. . . the law is clear that [Defendant] lacks standing to assert (and then take refuge in) [the third party's] time-barred position as to rights it may once have had.") (footnote omitted)).

The Gardner Declaration may, however, be considered in determining whether Plaintiff's copyrighted work is original. *See Premier Fabrics, Inc. v. Woodland Trading Inc.*, 42 F. Supp. 3d 549, 554 (S.D.N.Y. 2014) (noting that though a copyright registration gives rise to a presumption of the validity and originality of a work, the presumption may be rebutted by evidence that clearly demonstrates that a plaintiff's design lacks originality). If a work is not original, then it is unprotectible. *Boisson v. Banian, Ltd*, 273 F.3d 262, 268 (2d Cir. 2001). Proving originality does not impose a high bar. *See Shine v. Childs*, 382 F. Supp. 2d 602, 610 (S.D.N.Y. 2005) (quoting *see Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 764-65 (2d Cir.1991) (internal citations omitted) ("In the copyright context, originality means the work was independently created by its author, and not copied from someone else's work. The level of originality and creativity that must be shown is minimal, only an "unmistakable dash of originality need be demonstrated[.]"); *see also Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988) (noting the principle that the originality requirement for obtaining a copyright is an

extremely low threshold, unlike the novelty requirement for securing a patent.).

Notwithstanding Plaintiff' copyright registration, Defendant has submitted evidence that creates a disputed issue of material fact as to whether Plaintiff's Ghost Face Mask lacks originality.  The designs to which Defendant points—Alterian's circa 1991 Wailer mask—bear far more than a passing resemblance to the Ghost Face Mask.  *Cf. Premier Fabrics,* 42 F. Supp. 3d at 554 (declining to find that defendants' evidence was sufficient to rebut plaintiff's presumption of originality, where evidence consisted of public domain images and where images bore "only a passing resemblance" to those at issue in case.).  A comparison of Alterian's Wailer mask and the Ghost Face Mask demonstrate an obvious similarity in design of the facial color, shape, and features including the eyes, nose, forehead, cheeks, mouth, and shroud.



WAILER



(ECF No. 52-2, Gardner Decl. at ¶ 21; ECF No. 1-1, Compl., Ex. 1.)

In support of his assertion that Plaintiff does not own a valid copyright, Defendant submits a declaration from Mr. Gardner, stating that by the end of 1990, Alterian designers had created six original ghost masks, including the so-called Wailer mask, which was first sold nationwide in early 1991, "five years before our Wailer was depicted in *Scream*." (ECF No. 52-2, Gardner Decl. at ¶ 17.) Mr. Gardner's declaration further provides that the Alterian Ghost Factory—the Halloween-mask business arm of Alterian Studios—released the Wailer along with other ghost masks as part of its "line of DIY 'Ghost Maker' costume kits" in 1991. (*See* Gardner Decl. at ¶ 19-21.) Mr. Gardner's declaration includes exhibits from Alterian business records reflecting photographs and promotional materials related to the Ghost Maker kits. (*See* ECF No. 52-3-8, 52-11, Gardner Decl., Exs. A-F, I.) Defendant's evidence specifically includes Alterian's image of its Wailer shown immediately *supra*, taken from promotional inserts from the Spring of 1991 showing the Wailer Ghost Maker kit. (Gardner Decl. at ¶ 21; *see also* ECF No. 52-6, Gardner Decl., Ex. D, at p. 9.) Mr. Gardner attests that Alterian's "Ghost Factory" was presented at major industry trade shows from 1991-1994, where the Ghost Maker kits were prominently featured at Alterian's booths. (Gardner Decl. at ¶¶

26

23-25.)  Mr. Gardner further states that "the biggest national
expositions" were run by three main companies, one of which was
Easter Unlimited, which "had employees at each national event,
including at least one [Alterian] attended early in 1991,"
though Mr. Gardner states Easter Unlimited employees never
introduced themselves at Alterian's booth during these
expositions.  (*Id*. at ¶¶ 26-27.)

  Plaintiff responds to Defendant's evidence from Mr.
Gardner with a declaration from Plaintiff's principal, Mr.
Geller, stating he does "not know who Tony Gardner is," and that
he has "never seen 'Wailer' before this motion."  (ECF No. 53-2,
Geller Decl. in Opp. at ¶ 53.)  Mr. Geller further responds to
Defendant's argument by taking issue with certain terminology
that Mr. Gardner uses (*see id*. at ¶ 53 ("I do not understand the
meaning of the word 'sponsor' as Defendant uses it.")), and
asserting that he is unable to respond to Mr. Gardner's
statements without further specificity as to which expositions
Mr. Gardner is referring. (*Id*. at ¶¶ 53-54.)  Finally, Mr.
Geller responds that he finds it "curious" that Mr. Gardner
stated that he was not aware of an Easter Unlimited employee
visiting his booth at these expositions, while also "stating
that an employee (or employees) of Easter was(were) at this
unspecified event."  (*Id*. at ¶ 55.)  The facts and evidence
presented by Defendant could lead a jury to conclude that

Plaintiff or its representatives may have had direct access to
and knowledge of Mr. Gardner and Alterian's Wailer mask in 1991
through national expositions, and a comparison of the two works
demonstrates what the Court considers to be a visible and
substantial similarity.

Though the threshold for proving originality is low,
the Court finds, based on the evidence currently before the
Court, that the Defendant has presented sufficient evidence to
create a genuine issue of material fact as to whether the Ghost
Face Mask possesses the requisite originality for copyright
protection.  The Court cannot, however, say as a matter of law
that the Ghost Face Mask was not original enough to merit
copyright protection.  The Court will assume, for purposes of
the copyright infringement analysis, that Plaintiff owns a valid
copyright.  The Court turns next to the second part of the
copyright infringement analysis, and considers whether Defendant
copied constituent elements of the Plaintiff's work.  *See Feist
Publ'n, Inc.*, 499 U.S. at 361.

**B. Unauthorized Copying**

To prove that a defendant copied constituent elements
of a plaintiff's work, the plaintiff "must demonstrate that: (1)
the defendant has actually copied the plaintiff's work; and (2)
the copying is illegal because a substantial similarity exists
between the defendant's work and the protectible elements of

plaintiff's [work]." *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 66
(2d Cir. 2020) (quoting *Yurman Design, Inc. v. PAJ Inc.*, 262
F.3d 101, 110 (2d Cir. 2001)) (internal quotation marks
omitted).

In opposition to Plaintiff's partial motion for
summary judgment, Defendant argues that he attempted to "*allude
to* the mask from *Scream*" and that there is no substantial
similarity between his cartoon depiction and Plaintiff's
copyrighted sculpture. (Def. Memo. in Opp. at 6-7.) Even
drawing inferences in favor of the non-moving Defendant on
Plaintiff's partial motion for summary judgment, the Court finds
that Defendant cannot defeat Plaintiff's summary judgment motion
simply because Plaintiff describes Plaintiff's work as a
sculpture.

Defendant's alleged infringement of Plaintiff's Ghost
Face Mask in a different medium—a depiction on a garment rather
than a physical, three-dimensional sculpted mask—does not
preclude a finding of copyright infringement. "In copyright law
the medium is not the message, and a change in medium does not
preclude infringement." *Rogers v. Koons*, 751 F. Supp. 474, 477
(S.D.N.Y. 1990). The Second Circuit has previously determined
that where a defendant manufactured dolls from a book of
copyrighted cartoons, infringement occurred. *See Fleischer
Studios v. Ralph A. Freundlich, Inc.*, 73 F.2d 276, 276-77 (2d

Cir. 1934).  Similarly, the Second Circuit found copyright
infringement where a defendant manufactured a toy horse based on
a copyrighted newspaper cartoon.  *See King Features Syndicate v.*
*Fleischer*, 299 F. 533, 534 (2d Cir. 1924).  Regarding a change
in medium, these cases are nearly analogous to the instant case,
simply reversed: three-dimensional toys copied from two-
dimensional cartoons are the functional equivalents of two-
dimensional cartoons copied from three-dimensional toys.
Defendant's depiction of Plaintiff's three-dimensional Halloween
mask as a two-dimensional cartoon on a garment does not preclude
a finding of copyright infringement solely because of the change
in medium.  This is consistent with well-established Second
Circuit principle that reproduction through a different medium
"is omitting the work of the artisan, but appropriating the
genius of the artist."  *King Features Syndicate v. Fleischer*,
299 F. 533, 535 (2d Cir. 1924) (citing *Falk v. T.P. Howell &*
*Co.*, 37 F. 202, 202 (C.C.S.D.N.Y. 1888)); *see also Rogers v.*
*Koons*, 751 F. Supp. 474, 477 (S.D.N.Y. 1990), *aff'd*, 960 F.2d
301 (2d Cir. 1992) ("In copyright law the medium is not the
message, and a change in medium does not preclude
infringement.")

The Court next considers whether Mr. Rozier's cartoon
depiction is substantially similar to Plaintiff's Ghost Face
Mask.  "[Whether substantial similarity exists] is a factual

question and the appropriate test for determining whether substantial similarity is present is whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Ideal Toy Corp. v. Fab-Lu Ltd. (Inc.)*, 360 F.2d 1021, 1022 (2d Cir. 1966); *see also Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1001 (2d Cir. 1995); *Malden Mills, Inc. v. Regency Mills, Inc.*, 626 F.2d 1112, 1113 (2d Cir. 1980). Although substantial similarity is often a question reserved for the jury, it has also been resolved as a matter of law in the Second Circuit where "access to the copyrighted work is conceded, and the accused work is so substantially similar to the copyrighted work that reasonable jurors could not differ on this issue." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 992 F.3d 99, 124 (2d Cir. 2021) (citing *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992)); *see also Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) ("The question of substantial similarity is by no means exclusively reserved for resolution by a jury").

In the instant case, it is undisputed that the *Scream* mask—the Ghost Face mask licensed by Plaintiff for use in the *Scream* movie—was the basis for the cartoon mask depicted on Mr. Rozier's merchandise, and that he explicitly asked for the *Scream* mask to be depicted, albeit as a cartoon. (*See generally*

31

Def. 56.1 at ¶¶ 14-17.)  The two works are substantially
similar, and reasonable jurors would not differ in their
understanding that Mr. Rozier's cartoon depiction of the mask
was appropriated from the *Scream* mask, which had originated from
the Ghost Face Mask. Defendant's stated, though indirect,
objective was to evoke the *Scream* mask.  (ECF No. 52-12, Rozier
Decl. ¶ 22 ("*Scream* was my favorite, and I asked [that] we do a
cartoon showing me with a mask that looked like the one from the
Scream movies."))

For the reasons discussed above, the Court is
satisfied that as a matter of law, Defendant appropriated and a
lay person would recognize constituent elements of Plaintiff's
Ghost Face Mask, which had been licensed utilized as the *Scream*
mask.

### C. Fair Use

Despite having shown ownership of a valid copyright
and unauthorized copying, Plaintiff's claim of copyright
infringement will not succeed if Defendant's use is found to be
"fair use."  *See Andy Warhol Found. for Visual Arts, Inc. v.
Goldsmith*, No. 19-2420-CV, 2021 WL 3742835, at *4 (2d Cir. Aug.
24, 2021) (quoting *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir.
2006) ("The fair use doctrine seeks to strike a balance between
an artist's intellectual property rights to the fruits of her
own creative labor...'and the rest of us to express them—or

ourselves by reference to the works of others.'").  "While fair use presents a mixed question of law and fact, it may be resolved on summary judgment where[...] the material facts are not in dispute."  *Goldsmith*, 2021 WL 3742835, at *4.  Both the Supreme Court and the Second Circuit have emphasized that fair use is a context-sensitive inquiry that is incompatible with simple bright-line rules.  *See Goldsmith*, 2021 WL 3742835, at *5.

The fair-use doctrine was codified in the Copyright Act of 1976 and is a complete defense to copyright infringement: "the fair use of a copyrighted work . . . is not an infringement of copyright."  17 U.S.C. § 107.  The Copyright Act describes four non-exclusive factors to consider in determining whether the use made of a work constitutes a fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Blanch*, 467 F.3d at 250 (quoting 17 U.S.C. § 107).  Each of these statutory factors "are to be explored, and the results weighed together, in light of the purposes of copyright."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).

The Court now considers each factor in turn, analyzing the work at issue, Mr. Rozier's Scary Terry cartoon rendition of himself in a Ghost Face Mask, against its source material, Easter Unlimited's Ghost Face Mask (the mask used in *Scream*). Viewing the Ghost Face mask and the Scary Terry cartoon side-by-side, and considering the statutory analysis as detailed *infra*, the Court finds that Defendant's use of the *Scream* mask constitutes fair use.

## 1. The Purpose and Character of the Use

The first statutory factor, the purpose and character of the use, is "[t]he heart of the fair use inquiry." *Blanch*, 467 F.3d at 251 (quoting *Davis v. The Gap, Inc.,* 246 F.3d 152, 174 (2d Cir.2001)). The first statutory factor regarding purpose and character of the use requires courts to consider the extent to which the secondary work is "transformative," and whether it is commercial. *Goldsmith*, 2021 WL 3742835, at *5. As described immediately below, the Court finds that the Defendant's use of the Scary Terry cartoon sufficiently altered, transformed, or added new expressive meaning to the Ghost Face Mask such that the first statutory factor weighs in favor of fair use.

### a. Transformative Works

Analysis under the first factor focuses on the degree to which the use is transformative: "the [i]nquiry focuses on

whether the new work merely supersedes the objects of the
original creation, or whether and to what extent it is
'transformative,' altering the original with new expression,
meaning, or message." *Campbell*, 510 U.S. 569 (1994).  In the
Second Circuit, a court must "evaluate whether a work is
transformative by examining how it may 'reasonably be
perceived.'"  *Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir.
2013).  The Court must examine whether the secondary work's use
of the source material is for a "'fundamentally different and
new' artistic purpose and character, such that the secondary
work stands apart from the 'raw material' used to create it."
*Goldsmith*, 2021 WL 3742835, at *9.

        For a use to be transformative, it must do more than
simply repackage or republish the original work.  *See Authors
Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).
Defendant argues that his use of the Scary Terry cartoon was
"indisputably" fair use, as the merchandise bearing the stylized
cartoon version of the Ghost Face Mask was used to create "a
humorous article of clothing that commented on Rozier's 'Scary
Terry' persona," and "satirized the familiar trope of
professional athletes as remorseless 'killers,' and marked its
wearer as a Rozier fan."  (ECF No. 52-22, Def. Summ. J. Mem. at
p. 11.)  Defendant further argues that his use of the Ghost Face
Mask image was solely to invoke the *Scream* movie, and to "create

35

humor through the melding of the image of a celebrity basketball
player and an image associated with fictional serial killers."
(*Id.* at pp. 11-12.)  In opposition, Plaintiff argues that
Defendant's use was not fair use, because the Ghost Face Mask
and the Scary Terry cartoon have the same overarching purpose:
they are meant to be worn.  (ECF No. 53-2, Geller Decl. in Opp.
at ¶¶ 68-69.)  Plaintiff also argues that "Ghost Face® is most
known for being a faceless killer. That is precisely the imagery
Defendant intended to convey by creating images of himself
wearing the Ghost Face® mask."  (*Id.* at ¶ 72.)

        The Court notes two important preliminary matters
impacting the fair use analysis. First, though the parties did
not address the issue of fair use from this perspective,
Defendant's use could be considered "the secondary use of a
secondary use."  *See North Jersey Media Grp. Inc. v. Pirro*, 74
F. Supp. 3d 605, 617 (S.D.N.Y. 2015) (characterizing defendant's
use of a social media hashtag on a photograph created from a
combination of plaintiff's original copyrighted photograph with
a second photograph as "a secondary use of a secondary use"
which did not rise to the level of transformative use, and
further noting that the court had not found a case addressing
similar facts); *see also Fioranelli v. CBS Broad. Inc.*, No. 15-
cv-0952 (VSB), 2021 WL 3372695, at *27 (S.D.N.Y. July 28, 2021)
(citing *Pirro* and noting that defendant's secondary use adding

commentary to certain September 11 video footage could be considered "the secondary use of a secondary use" which *did* imbue the original work with "new insights and understandings."). Here, Plaintiff's Ghost Face Mask was licensed for use in the *Scream* films in which it was worn by a serial killer and was instilled with meaning beyond a Halloween ghost costume. The Defendant's use of the *Scream* mask to create a humorous embodiment of an NBA basketball player who was known as a "killer" scorer further transformed the Ghost Face Mask with new meaning, expression, and messaging.

Second, the Court finds that Defendant did not simply replicate the Plaintiff's Ghost Face Mask, as the image used by Defendant on his Scary Terry merchandise is distinct from Plaintiff's mask in that 1) the Defendant's mask appears in cartoon form, 2) the cartoon mask is accompanied by and appended to the cartoon and child-like figure of Mr. Rozier in his NBA uniform, 3) altogether, the cartoon depicts Mr. Rozier wearing the cartoon mask in his basketball uniform, and 4) the cartoon is placed above text reading "Scary Terry." (*See* Def. 56.1 at ¶ 19.; ECF No. 1-1, Compl., Ex. 1.) In this context, the Defendant's use is directed to his NBA fans and invokes "killer" players who vanquish opposing teams.

### b. Parodical and Satirical Works

Parodican and satirical works may qualify as fair use. *See Campbell*, 510 U.S. at 579 ("[P]arody, like other comment or criticism, may claim fair use under § 107.") (internal citations omitted). Defendant argues that his invocation of the *Scream* mask constitutes parody and satire, and as such, is a "classic fair use." (ECF No. 52-22, Def. Summ. J. Mem. at pp. 10-11.) Parody has been defined as a "literary or artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule," or as a "composition in prose or verse in which the characteristic turns of thought and phrase in an author or class of authors are imitated in such a way as to make them appear ridiculous." *Campbell*, 510 U.S. at 580 (citing American Heritage Dictionary at 1317 (3d ed. 1992); 11 Oxford English Dictionary 247 (2d ed. 1989)). Defendant also argues that the Scary Terry cartoon is satirical: the humorous cartoon on Defendant's clothing commented on the Scary Terry persona and "satirized the familiar trope of professional athletes as remorseless 'killers[.]'" (ECF No. 52-22, Def. Summ. J. Mem. at p. 11.) Satire has been defined as a work "in which prevalent follies or vices are assailed with ridicule," or are "attacked through irony, derision, or wit[.]" *Campbell*, 510 U.S. at 581 (citing American Heritage Dictionary at 1604 (3d ed. 1992); 14 Oxford English Dictionary, at 500). Though parody needs to

mimic the original, "satire can stand on its own two feet and so requires justification for the very act of borrowing." *Campbell*, 510 U.S. at 580–81.

### i. Parody

As the Supreme Court recognized in *Campbell*, "the heart of any parodist's claim to quote from existing material is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." *Campbell*, 510 U.S. at 580. In *Campbell*, the Supreme Court also recognized that parody, which "needs to mimic an original to make its point," is regularly held to be transformative. *Campbell*, 510 U.S. at 580–81.

The Court's analysis is complicated by the fact that, here, Defendant did not seek to parody the underlying source material—Easter Unlimited's Ghost Face Mask—but rather, the Ghost Face Mask specifically licensed and used in the *Scream* films by a serial killer character. As noted *supra*, this "secondary use of a secondary use" raises the issue of "whether the commentary [Defendant] wished to convey created anything new at all, much less anything transformative." *Pirro*, 74 F. Supp. 3d at 617 (S.D.N.Y. 2015). Defendant explains at length that, in the Scary Terry merchandise at issue, Mr. Rozier is depicted as a cartoon in a basketball uniform donning a serial killer mask to humorously associate his Scary Terry persona with the

NBA community's trope of referring to prolific scorers as "killers."  (Def. 56.1 ¶ 9.)  Defendant argues that the cartoon depiction of the *Scream* mask on a cartoon basketball player parodies the famous mask-wearing, murderous villain in the *Scream* films.  (ECF No. 52-22, Def. Summ. J. Mem., pp. 11-12.) Given the added complication of Defendant's secondary use of a secondary use, the Court notes that Defendant's use does not necessarily mimic *the* original—the Easter Unlimited's Ghost Face Mask—but does "mimic *an* original" in that the Scary Terry cartoon mimics the *Scream* films' Ghostface serial killer (who wears the mask).  *Campbell*, 510 U.S. at 580-81 (emphasis added). The Court considers that it is appropriate to conduct its fair use analysis for parody acknowledging the *Scream* mask as "an original," (*id*.) particularly given that Easter Unlimited's Ghost Face Mask was licensed for use in *Scream*.  (*See* Pl. 56.1 at ¶¶ 23-24 (Easter Unlimited granted Dimension Films a license to use the Ghost Face Mask in the 1996 film *Scream*.).)

Many of the cases Defendant cites support his contention that the Scary Terry merchandise is a parody of the *Scream* mask.  For example, two of Defendant's cited cases involve Louis Vuitton and the use of its copyrighted designs for parodical items meant to comment on the famous luxury brand. *See Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425, 435 (S.D.N.Y.), *aff'd*, 674 F. App'x 16 (2d Cir.

2016) (fair use where a tote bag with the phrase 'My Other Bag' written on one side "combined with the stylized, almost cartoonish renderings of Louis Vuitton's bags depicted on the [other side] builds significant distance between [Defendant's] inexpensive workhorse totes and the expensive handbags they are meant to evoke, and invites an amusing comparison between [Defendant] and the luxury status of Louis Vuitton"); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 261, 270 (4th Cir. 2007) (though the court was addressing a copyright claim in what was more appropriately a trademark context, the court noted that defendant's use as a parody of altered elements of plaintiff's design did not support a claim for copyright infringement, and noted as part of the parody analysis, that "the [Chewy Vuiton] dog toy is a comment on the rich and famous, on the Louis Vuitton name and related marks, and on conspicuous consumption in general"). These Louis Vuitton cases involve a secondary use that more clearly comments on the original works of the authors they copy. By comparison, as noted *supra*, Defendant's use is more attenuated from what is traditionally considered the "original" work, as the Scary Terry image humorously invokes in cartoon form the *Scream*-related association with a fictional serial killer, rather than providing commentary on Plaintiff or the Ghost Face Mask itself. (Def. 56.1, ¶¶ 9-10, 14-16; *see also* ECF No. 52-22 Def. Summ. J.

Mem. ("[t]he mask image was used solely to invoke the *Scream*

movie[.]").)  Thus, viewing the *Scream* mask as the original that

Defendant parodies, a reasonable trier of fact could conclude

that Defendant's use was a transformative alteration of the

"original" work "with new expression, meaning, or message" (*see*

*Campbell*, 510 U.S. 569) and a fundamentally different "purpose

and character" (*id.* at 584, citing 17 U.S.C. § 107) and thus

constitute a parody.  Said differently, even if the Scary Terry

cartoon does not comment directly on either the Ghost Face Mask

or its creator Easter Unlimited, the Scary Terry cartoon instead

successfully uses a cartoon rendering of the Plaintiff's

licensed *Scream* mask on a cartoon basketball player to lampoon

the famous mask-wearing movie villain and killer in the context

of NBA players, NBA fans, and even the NBA media.  Defendant's

humorous and whimsical reimagination of the Ghost Face Mask

does, "at least in part," comment on Plaintiff or its work (as

used in *Scream*), as required for protection as parody under

copyright law, favoring a finding of fair use and summary

judgment for Defendant.  *Campbell*, 510 U.S. at 580.

### ii.  Satire

The Court next considers whether the Defendant's use

of the Ghost Face Mask constitutes satire, which is distinct

from parody as a basis for fair use.  The Second Circuit

addressed the distinction between parody and satire in *Blanch v.*

*Koons*, where the Circuit found defendant artist Jeff Koons' use of a fashion photograph to be satire. *Blanch*, 467 F.3d at 247. In *Blanch*, the defendant used part of a photograph of the legs of a model wearing sandals, and placed that image in the midst of other images to create a new work. *Id*. at 247. The Circuit held that there was fair use, and noted that the defendant's work: "may be better characterized for these purposes as satire— its message appears to target the genre of which [the original photograph] is typical, rather than the individual photograph itself." *Blanch*, 467 F.3d at 254. "Satire has been defined as a work 'in which prevalent follies or vices are assailed with ridicule,' [...] or are 'attacked through irony, derision, or wit[.]'" *Id*. at 255 (quoting *Campbell*, 510 U.S. at 581 n. 15.).

To analyze whether the Scary Terry cartoon constitutes satire, the Court must consider whether the Defendant "had a genuine creative rationale for borrowing [Plaintiff's] image, rather than using it merely 'to get attention or to avoid the drudgery in working up something fresh.'" *Blanch*, 467 F.3d at 255. Defendant has offered an indisputable rationale as to why he used Plaintiff's copyrighted work:

> Rozier and his management team decided that the clothing line would feature the name "Scary Terry," as well as a cartoon drawing of Rozier accompanied by a mask associated with a serial killer from popular horror.[4]

[4] Plaintiff attempts to dispute Mr. Rozier's statement (*see* ECF No. 52-1, Def. 56.1 at ¶ 10; ECF No. 52-12, Rozier Decl. at ¶ 20) as follows: "Defendant has

Rozier and his management team selected a serial killer mask for the "Scary Terry" clothing as a way to poke fun both at the 'Scary Terry' persona and the common practice of referring to professional athletes—especially hot-shooting point guards—as remorseless "killers." [...]Rozier asked that a version of the cartoon also be done that invoked the mask from the movie *Scream*. Rozier asked for a version of the *Scream* mask for sentimental reasons. *Scream* is one of Rozier's favorite movies and was very important to him growing up, where its mix of violence and humor provided solace and escapism in a childhood surrounded by violence.

(Def. 56.1 ¶¶ 9-10, 14-16; Rozier Decl. at ¶¶ 6-9, 20-21, 23.)

The Court finds that Defendant's use of a mask widely associated with a film's (fictional) serial killer provides a means of satirizing and ridiculing the perception of ruthless, high-scoring athletes in the NBA, as well as underscoring the humor in the Scary Terry moniker. Given the absence of genuine issues of material fact as to Defendant's rationale in selecting the Ghost Face Mask, the Court finds that Defendant has established "justif[ication for] the very act of [his]

---

been oft-quoted as saying 'I love scary movies [and] Scream is my favorite. The way he talks on the phone, talks stuff and all that… one of the guys in my agency who does marketing sent me shirts. It had the Jason mask on there. And I was like, 'We need to get the Scream mask on there." Then, around the time the playoffs, we started selling them out.'" (*See* ECF No. 53-1, Pl. Resp. 56.1 at ¶ 10.) The Court does not consider Plaintiff's argument to raise a genuine issue of material fact regarding the satirical nature of defendants' clothing line in connection with Scream and NBA professional basketball. *See SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir.2009) ("[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party.").

borrowing[,]" and accordingly, Defendant's use may properly be characterized as satire. *Blanch*, 467 F.3d at 255, *citing Campbell*, 510 U.S. at 581.

### iii.  Other Transformative Use

As a final argument in favor of the transformative nature of Defendant's use of the Ghost Face Mask, Mr. Rozier argues that the clothing bearing the Scary Terry cartoon marked its wearers as fans of Mr. Rozier.  (ECF No. 52-22, Def. Summ. J. Mem. at p. 11.)  The Court agrees that the Scary Terry merchandise serves the purpose of identifying and connecting Defendant's fans with Defendant's Scary Terry persona, a significantly different use and purpose from that of the original work.  Defendant's merchandise imbues the Ghost Face Mask—indeed, even the *Scream* mask, "with a further purpose or different character, altering the first with new expression, meaning, or message."  *Campbell*, 510 U.S. at 579 (internal citations omitted).  The Court considers that this aspect of the first factor weighs in favor of a finding of fair use, and finds Defendant's use to be transformative, and to qualify as both parody and satire.

### c. Commercial Use

As part of the first factor, the Court must also consider "whether, and to what extent, Defendant's use was for commercial purpose."  *Pirro*, 74 F. Supp. 3d at 618-19. The

relative importance of the commercial use in factor one is "determined on a sliding scale: the more transformative the work, the less important the commercial purpose." *Id.* at 618.

Here, there is no question that Defendant's Scary Terry merchandise was used for commercial purposes. Though Defendant asserts that his use of the *Scream* mask was not *purely* for commercial purposes, it is not disputed that Defendant marketed and sold his Scary Terry merchandise to customers, and profited from the sale of the merchandise. (*See* ECF No. 50-1, Def. Resp. to Pl. 56.1 ¶ 11.) Defendant first sold his Scary Terry t-shirts and sweatshirts online through his social media and a dedicated website before authorizing parties such as Barstool Sports, I Love Boston Sports, and ISlide USA to sell Scary Terry merchandise themselves. (*Id.* at ¶¶ 24-31.) Mr. Rozier received approximately $150,000 in gross sales revenue from the sale of the Scary Terry clothing. (*Id.* at ¶ 40.) By his own admission, Mr. Rozier sought to capitalize on the surging popularity of his Scary Terry persona and, in response, had more merchandise made to sell to his fans. (*Id.* at ¶¶ 23-24.) Defendant also argues that the fact that his use of the mask was for purposes of commentary means that the for-profit nature of his use "merits little consideration." (ECF No. 52-22, Def. Summ. J. Mem. at fn. 2.)

Though a commercial motive weighs against a finding of
fair use, the Court notes that finding a secondary use is of a
commercial nature does not necessarily bar a finding of fair use
because "nearly all of the illustrative uses listed in the
preamble paragraph of § 107, including news reporting, comment,
criticism, teaching, scholarship, and research . . . 'are
generally conducted for profit in this country.'" *Campbell*, 510
U.S. at 584 (quoting *Harper & Row Publishers, Inc. v. Nation
Enterprises*, 471 U.S. 539, 592 (1985) (Brennan, J.,
dissenting)). Of course, in some circumstances, a commercial
motive will weigh against a finding of fair use under the first
statutory factor, including instances where there is a low
degree of transformative purpose. *See Capitol Recs., LLC v.
ReDigi Inc.*, 910 F.3d 649, 661 (2d Cir. 2018).

Here, the Court notes that the import of Defendant's
commercial use may be mitigated because, for the reasons
mentioned above, Defendant's merchandise may reasonably be
perceived to be transformative. *See Goldsmith*, 2021 WL 3742835,
at *11 ("the commercial nature of a secondary use is of
decreased importance when the use is sufficiently transformative
such that the primary author should not reasonably expect to be
compensated.") (internal citations omitted).

As the Court considers that Defendant's use was
parodical, satirical, and transformative, the Court concludes

that Defendant's commercialization of the Scary Terry merchandise without licensing from Plaintiff is of decreased importance.  Accordingly, based on the undisputed record, the Court concludes that the first "purpose and character" factor favors Defendant's fair use.

### 2. The Nature of the Copyrighted Work

The second statutory factor directs courts to consider "the nature of the copyrighted work."  17 U.S.C. § 107(2).  The Second Circuit has instructed courts to consider two questions when evaluating the second factor of fair use of a copyrighted work:

> (1) whether the work is expressive or creative . . . or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower.

*Blanch*, 467 F.3d at 256.  There is no dispute that Plaintiff's work is both creative and published.  *See* 17 U.S.C.A. § 101 ("'Publication' is the distribution of copies or phonorecords of a work to the public by sale[.]")  The creative and published nature of Plaintiff's work weighs against a finding of fair use. The court notes, however, that "[a]lthough courts are required to consider and weigh this factor, it 'has rarely played a significant role in the determination of a fair use dispute.'"

*Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015).
Further, similar to the commercial character of Defendant's
work, "the second factor may be of limited usefulness where the
creative work of art is being used for a transformative
purpose." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448
F.3d 605, 612 (2d Cir. 2006) (citing *Campbell*, 510 U.S. at 586).
With limitations noted immediately *supra*, the Court finds that
the second factor involving the creative and published nature of
Defendant's work favors Plaintiff.

### 3. The Amount and Substantiality of the Use

The third statutory factor directs courts to consider
"the amount and substantiality of the portion [of the
copyrighted work] used [by Defendant] in relation to the
copyrighted work as a whole." 17 U.S.C. § 107(3). The key
question for the Court to consider as to this factor is whether
"the quantity and value of the materials used [by Defendant] are
reasonable in relation to the purpose of the copying."
*Campbell*, 510 U.S. at 586. Framed differently, the third factor
of the fair use analysis asks the Court to consider "whether the
copying used more of the copyrighted work than necessary and
whether the copying was excessive." *HathiTrust*, 755 F.3d at 98.

Here, Defendant argues that this factor weighs heavily
in favor of fair use because (1) the Scary Terry clothing did
not incorporate an exact reproduction of the mask, instead using

a stylized cartoon image; and (2) the clothing's use of the image was reasonable in relation to the purpose of the copying. (ECF No. 52-22, Def. Summ. J. Mem. at 13.) The Court has already determined that, whether in two-dimensional cartoon form or not, Defendant copied constituent elements of Plaintiff's original work as a matter of law; the works are substantially similar so that reasonable jurors could find that Mr. Rozier's cartoon depiction of the mask has been appropriated from the *Scream* mask, which was licensed as Plaintiff's Ghost Face Mask. In quantitative terms, Defendant's merchandise copies the Ghost Face Mask, with regard to the configuration and shape of the head and facial features.

The Second Circuit has instructed that there are no exact rules as to how much of a copyrighted work may be copied and still considered a fair use. *HathiTrust*, 755 F.3d at 98 (internal citations omitted). Analogous to the present case, this factor "weighs less when considering a photograph—where all or most of the work often must be used in order to preserve any meaning at all—than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value." *Pirro*, 74 F. Supp. 3d at 621 (internal citations omitted). Here, the mask is more analogous to a photograph than a musical composition. Given Defendant's stated purpose—to invoke *Scream*—Defendant necessarily copied a

substantial portion of the Ghost Face Mask as used in *Scream*,
albeit in two-dimensional, cartoon form, for the purposes of
ensuring recognition.  (Def. 56.1 at ¶¶ 14-16.)  Given the
extent of Defendant's use of the Ghost Face Mask, in combination
with the arguable need for Defendant to use the main features of
the mask for his asserted purpose, the Court finds that the
amount and substantiality factor is neutral, and weighs neither
for or against a finding of fair use.

### 4. The Effect of the Use on the Market for the Original

The fourth statutory factor directs courts to consider
"the effect of the use upon the potential market for or value of
the copyrighted work."  17 U.S.C. § 107(4).  The Supreme Court
has identified the fourth factor as being "undoubtedly the
single most important element of fair use." *Harper & Row
Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 566
(1985).  Importantly, "the ultimate burden of proving that the
secondary use does not compete in the relevant market is
appropriately borne by the party asserting the defense: the
secondary user." *Goldsmith*, 2021 WL 3742835, at *15.

In evaluating a potential fair use under the fourth
factor, courts should look not only to "the extent of market
harm caused by the particular actions of the alleged infringer,
but also 'whether unrestricted and widespread conduct of the
sort engaged in by the defendant ... would result in a

substantially adverse impact on the potential market' for the original." *Pirro*, 74 F. Supp. 3d at 621, (citing *Campbell*, 510 U.S. at 590 (quoting 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.05[A][4] (1993)). The key question is not "whether the secondary use suppresses or even destroys the market for the original [or] potential derivatives, but whether the secondary use *usurps* the market of the original work." *Blanch*, 467 F.3d at 258 (emphasis added).

Plaintiff submits through the Geller Declaration that its primary assets are its proprietary costumes, masks, holiday items, and novelty gifts, and that "[its] business model of developing original costumes, masks, holiday items and novelty gifts is dependent on its ability to protect its exclusive right to market or license such products." (ECF No. 53-2, Geller Decl. in Opp. at ¶ 7.) Plaintiff further asserts that Defendant's use of the Ghost Face Mask on "wearing apparel" is the type of use for which Plaintiff requires authorization, and that Plaintiff "also licenses its intellectual property for use on items such as t-shirts bearing its trademarked Ghost Face image."[5] (*Id*. at ¶¶ 61-62.) Defendant, in turn, asserts that

---

[5] Plaintiff did not identify any of these apparel licensures with any specificity or otherwise identify any evidence to support this statement, and Defendant disputes that his "Scary Terry" products were substantially similar to other products sold and/or licensed by Plaintiff. (ECF No. 50-1, Def. Resp. to Pl. 56.1, at ¶ 47, citing to ECF No. 52-12, Rozier Decl. ¶¶ 28-29 (describing image of allegedly infringing use).)

the Scary Terry merchandise and the Ghost Face Mask have very different target audiences, as "Easter Unlimited sells costumes and novelty item[s] for holidays," and does "not sell sports apparel, let alone sell it specifically to fans of Rozier and the 'Scary Terry' persona, who were the target market for the 'Scary Terry' apparel." (ECF No. 52-22, Def. Summ. J. Mem., at p. 14; *see also* Def. 56.1, at ¶¶ 35-36; ECF No. 52-1, Rozier Decl. at ¶¶ 29-30, 35-37.)

The first and the fourth factors are linked, as "the more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015) (internal citations omitted). Although the Court recognizes that a loss in potential licensing revenues does not always result in the fourth factor favoring the copyright holder (*see Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929 (2d Cir. 1994)), the Court notes in particular Plaintiff's undisputed assertion that it already licenses the Ghost Face Mask for use on apparel, like t-shirts. (ECF No. 53-2, Geller Decl. in Opp. at ¶¶ 61-62.) The Court also notes that it must consider the fourth factor with its finding regarding the first factor for fair use: here, the Court has found the use of the Scary Terry merchandise was transformative and used for a different purpose

than the original work.  Finally, and critically, the Court must also consider whether "unrestricted and widespread conduct of the sort engaged in by [Mr. Rozier] would result in a substantially adverse impact on the potential market" for the Ghost Face Mask.  *See Campbell*, 510 U.S. at 590 (internal quotation marks omitted).

Ultimately, the Court is persuaded that Defendant has identified a distinct and relevant market of fans for his Scary Terry merchandise, and that based on the evidence currently in the record, the Court finds it unlikely that Defendant's merchandise will usurp the primary market of holiday and party consumers for the Ghost Face Mask.  Here, the Court cannot conclude that Defendant's Scary Terry merchandise is a competing substitute for Easter Unlimited's products, because of the added content that is both unrelated to prior associations with the Ghost Face Mask and specific to Defendant's use, specifically, Mr. Rozier, the Celtics, and professional basketball generally. The Court has considered whether Mr. Rozier's widespread and transformative use of the *Scream* mask, if unchecked and widespread, would result in substantial adverse impact for Plaintiff's potential market.  The Court concludes that this is precisely the kind of tension that exists between the enforcement of a copyright and the fair use doctrine, which "seeks to strike a balance between an artist's intellectual

property rights[...]including the right to license and develop
(or refrain from licensing or developing)[...] and 'the ability
of []the rest of us to express them- or ourselves by reference
to the works of others.'" *Goldsmith*, 2021 WL 3742835, at *4
(citing *Blanch*, 467 F.3d at 250). Though a slew of parodical,
satirical, or other transformative uses of the Ghost Face Mask
could certainly adversely impact Plaintiff's potential market,
these hypothetical fair uses are not the type of contemplated
use that would compel a finding in favor of the copyright
holder. The fourth factor weighs in favor of a finding of fair
use.

### 5. Summary

In conclusion, for the reasons stated above in an
evaluation of the four statutory factors, the Court finds that
Defendant's use of the Ghost Face Mask is defensible under the
fair use doctrine. Though "fair use presents a mixed question
of law and fact, it may be resolved on summary judgment where,
as here, the material facts are not in dispute." *Goldsmith*,
2021 WL 3742835, at *4. Based on the facts currently in the
record, having considered both Plaintiff's partial motion for
summary judgment and Defendant's motion for summary judgment and
drawing inferences accordingly, the Court 1) grants summary
judgment in favor of Defendant on the Plaintiff's copyright
infringement, contributory infringement and vicarious

infringement claims based on Defendant's fair use of the Ghost
Face Mask; and 2) denies Plaintiff's motion for summary judgment
as to copyright infringement, contributory infringement, and
vicarious infringement. *See Brown v. Netflix, Inc.*, 462 F.
Supp. 3d 453, 464 (S.D.N.Y. 2020), aff'd, 855 F. App'x 61 (2d
Cir. 2021) (citing *Cariou*, 714 F.3d at 712) ("[t]here can be no
contributory, vicarious, or inducement of infringement where no
direct infringement exists. [...] Because Defendants have
successfully invoked the doctrine of fair use, no underlying
direct infringement exists.") (internal citations omitted).
Defendant's motion for summary judgment is granted and
Plaintiff's partial motion is denied as to Plaintiff's copyright
infringement, contributory, and vicarious infringement claims.

## II.   Trademark Claims

Plaintiff moves, and Defendant cross-moves, for
summary judgment on Plaintiff's claim for trademark infringement
(Count IV).  (*See* ECF No. 13, Am. Compl.; *see also* ECF No. 49-5,
Pl. Mem. Supp.; ECF No. 52-22, Def. Summ. J. Mem.)  Defendant
also moves for summary judgment on Plaintiff's trademark claims
for federal trademark counterfeiting (Count V) and dilution by
blurring (Count VI).  (*Id.*)  For the reasons discussed infra,
the Court grants Defendant summary judgment on all of
Plaintiff's trademark claims and denies Plaintiff's motion for
summary judgment on Plaintiff's trademark infringement claims.

## A. Trademark Infringement

To prevail on a trademark infringement claim under the Lanham Act, a plaintiff "must demonstrate that (1) 'it has a valid mark that is entitled to protection' and that (2) the defendant's 'actions are likely to cause confusion with [that] mark.'" *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) (citing *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996)).[6] The Lanham Act is a strict liability statute, and accordingly, a trademark registrant does not need to prove knowledge or intent in order to establish liability. *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 153 (E.D.N.Y. 2016) (citing *Procter & Gamble Co. v. Quality King Distrib., Inc.*, 123 F. Supp. 2d 108, 113 (E.D.N.Y.2000)).

Plaintiff provided evidence proving the first element of trademark infringement: it is undisputed that Plaintiff owns a valid and protectable trademark described below. (Pl. 56.1 at

---

[6] The Court notes that although Defendant is not necessarily using the Scary Terry cartoon as a mark, "[t]erms not used as a mark may still generate confusion as to "affiliation, connection, ... association[,] ... sponsorship or approval [...] and therefore constitute trademark *infringement*." *Tiffany & Co.*, 971 F.3d at 95 emphasis in original) (citing § 1125(a)(1)(A)). *See also* 15 U.S.C. § 1127 (defining "trademark" and "service mark" as "any word, name, symbol, or device, or any combination thereof" used "to indicate the source" of goods and services).

¶¶ 28-30.)[7]  The most recent, third trademark for the Ghost Face

name and logo was updated and registered in 2012 under Reg. No.

4,256.208.  (*Id.* at ¶ 30; *see also* ECF No. 14-2, Am. Compl.

Exhibit 3, USPTO Reg. No. 4,256,208, at p. 1.)  Plaintiff's

third trademark is described in the USPTO registration as

follows:

> The mark consists of a stylized
> representation of a ghost outlined in red
> with a white face, black eyes, nose and
> mouth, a black cloak and holding a black and
> gray knife in its left hand. The stylized
> working 'Ghost Face' appears in shades of
> gray to the white below the ghost design
> with a red drop hanging off the letter 'f'
> in 'face.' The black rectangle represents
> background only and is not part of the mark.

(ECF No. 14-2, Am. Compl. Exhibit 3, USPTO Reg. No. 4,256,208,

at p. 1.)  The image of the mark as shown on the USPTO

registration is depicted below:



---

[7] The Court will reference Plaintiff's registered trademark (USPTO Reg. No. 4,256,208), and not the Ghost Face Mask as a standalone image, in its analysis.  In Plaintiff's submissions, Plaintiff's references to its mark at times appear to conflate its copyrighted Ghost Face Mask and its registered trademark as the mark over which it is claiming trademark infringement. (*See, e.g.,* ECF No. 49-5, Pl. Mem. in Supp. at p. 16 ("[T]he strength of Plaintiff's mark cannot be disputed. Indeed, that is precisely the reason for which Defendant wanted Ghost Face to be the identity of "Scary Terry."); ECF No. 49-2, Geller Decl. at ¶ 46, ("Defendant's usage of Plaintiff's registered trademark for its Ghost Face mask[...]").)

(*Id.*)

As Plaintiff has satisfied the first element of the
infringement analysis, the Court next considers whether
Defendant's Scary Terry merchandise was likely to cause
confusion with Plaintiff's registered trademark. The "mere
possibility of confusion is not enough[...] a plaintiff must
prove 'a probability of confusion ... affecting numerous
ordinary prudent purchasers.'" *Tiffany & Co.*, 971 F.3d 74, 84
(citing *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373,
383 (2d Cir. 2005)).

Courts in this Circuit assess the likelihood of
consumer confusion by balancing the *Polaroid* factors as
articulated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d
492, 495 (2d Cir. 1961).[8] *See Disney Enterprises, Inc. v.
Sarelli*, 322 F. Supp. 3d 413, 432 (S.D.N.Y. 2018) (citing *Kelly-
Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013)). The
*Polaroid* test balances the following eight factors: (1) the

---

[8] Though Defendant raises a First Amendment argument by stating that his
parodical and satirical use of the mark invokes First Amendment protections,
the Court notes that Defendant's evocation of the *Scream* mask for purposes of
parody and satire in the copyright context is distinguishable from the
trademark context, where Defendant is not parodying or satirizing Plaintiff
or its mark. The Court further notes that, "because the mark is being used
at least in part to promote a somewhat non-expressive, commercial product,
the First Amendment does not extend to such use, or to the extent that it
does, the balance tips in favor of allowing trademark recovery, if in fact
consumers are likely to be confused." *Tommy Hilfiger Licensing, Inc. v.
Nature Labs, LLC*, 221 F. Supp. 2d 410, 415-16 (S.D.N.Y. 2002) (citing *Harley
Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812-13 (2d Cir. 1999).
Accordingly, the Court will analyze the likelihood of confusion under the
*Polaroid* factors, applying as appropriate the underlying, parodical and
satirical purposes of Defendant's Scary Terry cartoon.

strength of the trademark; (2) the degree of similarity between the plaintiff's mark and the defendant's allegedly imitative use; (3) the proximity of the products and their competitiveness with each other; (4) the likelihood that the plaintiff will "bridge the gap" between its established market and the defendant's market by developing a product for sale in the defendant's market; (5) evidence of actual consumer confusion; (6) evidence that the defendant adopted the imitative term in bad faith; (7) the respective quality of the products; and (8) the sophistication of the relevant population of consumers. *See Tiffany & Co.*, 971 F.3d at 84–85 (citing *Polaroid*, 287 F.2d at 495).

The "evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (internal quotation marks omitted). Based on an analysis of all eight *Polaroid* factors, the Court finds that the likelihood of confusion analysis favors Defendant.

**1. Strength of Plaintiff's Mark**

"The strength of a mark is determined by its tendency to uniquely identify the source of the product." *Star Indus.*,

412 F.3d 373, 384. In determining the strength of a mark and its tendency to identify the source of a product, courts consider two forms of the mark's distinctiveness: (1) inherent distinctiveness (*see id.* at 373, ("its intrinsic nature serves to identify its particular source[.]")),[9] and (2) distinctiveness in the marketplace (*id.* (when the mark is "distinctive by virtue of having acquired a 'secondary meaning' in the minds of consumers.")). *See Hypnotic Hats, Ltd. v. Wintermantel Enterprises, LLC*, 335 F. Supp. 3d 566, 583 (S.D.N.Y. 2018) (citing *Limited v. Macy's Merck Group Inc.*, No. 15-cv-3645, 2016 WL 4094913, at *6 (S.D.N.Y. Aug. 2, 2016) (citing *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743-44 (2d Cir. 1998)). Here, as explained further *infra*, the Court finds Plaintiff's mark to be less strong based on its "descriptive" nature, but further finds that Plaintiff has not proffered evidence that the intrinsic nature of its mark identifies Plaintiff Easter Unlimited as the source.

### a. Inherent Distinctiveness

First, in determining the strength of the mark, the Court analyzes Plaintiff's mark's inherent distinctiveness. Plaintiff has failed to demonstrate that its registered trademark is entitled to a conclusive presumption of

---

[9] As to inherent distinctiveness, "[m]arks are classified, in ascending order of strength, as (1) generic; (2) descriptive; (3) suggestive; [or] (4) arbitrary or fanciful." *Star Indus.*, 412 F.3d at 384-85.

distinctiveness as an incontestable mark because Plaintiff has
not proffered any evidence that its mark has been in continuous
use for five years.  *See Hypnotic Hats*, 335 F. Supp. 3d at 583,
(citing *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir.
2004) ("an incontestable registered trademark enjoys a
conclusive presumption of distinctiveness."); *see also Gruner +
Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d
Cir.1993) ("A registered mark becomes incontestable if it has
been in continuous use for five consecutive years subsequent to
its registration and is still in use[.]") (internal citations
omitted).  Accordingly, the Court must analyze the
characteristics of the mark itself to determine its inherent
distinctiveness.

Because Plaintiff's mark is registered, the Court
preliminarily assumes that the mark is inherently distinctive.
*See Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d
337, 345 (2d Cir. 1999) (citing 15 U.S.C. § 1115(a) ("A
certificate of registration with the PTO is prima facie evidence
that the mark is registered and valid (i.e., protectible) [...]
Registration by the PTO without proof of secondary meaning
creates the presumption that the mark is more than merely
descriptive, and, thus, that the mark is inherently
distinctive.").  Upon closer analysis of the mark itself,
however, the Court considers Plaintiff's mark to be descriptive.

Descriptive marks "are those consisting of words identifying qualities of the product." *Star Indus.*, 412 F.3d at 385. Plaintiff's mark spells out the words "Ghost Face" in addition to depicting a shrouded figure wearing a *Ghost Face* mask, and is therefore directly descriptive of Plaintiff's underlying Ghost Face product. *Id.* Accordingly, the Court considers Plaintiff's descriptive mark not to be inherently distinctive. *See Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (descriptive marks provide "an immediate idea of the ingredients, qualities or characteristics of the goods," and thus are generally not inherently distinctive). (internal quotation marks omitted) (citation omitted).

### b. Distinctiveness in the Marketplace

Second, to determine the strength of the mark, the Court also must consider the mark's distinctiveness in the marketplace based on associations—or "secondary meaning"—that the mark has gained through its use in commerce. *Streetwise Maps*, 159 F.3d at 743–44. Secondary meaning is defined as "an identity that consumers associate with a single source, even though the source itself may be unknown." *Gruner + Jahr*, 991 F.2d at 1076. Plaintiff has not proffered any evidence that consumers associate the Ghost Face mark with Easter or any other single source.

In assessing the distinctiveness in the marketplace, the Court may look to factors "such as third-party use of similar marks, duration of use, and sales volume," which evidence is lacking here. *Nature's Best, Inc. v. Ultimate Nutrition, Inc.*, 323 F. Supp. 2d 429, 432 (E.D.N.Y. 2004). As a preliminary matter, the Court notes that Plaintiff appears to conflate the wide recognition of the *Scream* franchise and Plaintiff's Ghost Face Mask as featured in *Scream* with the strength of its own mark. Plaintiff asserts that "[t]he Ghost Face Mask has been a famous copyright *and trademark* of Plaintiff's for many years." (Pl. 56.1, at ¶ 22.) (emphasis added.) Plaintiff does not submit any evidence or proffer any facts that consumers associate the Ghost Face mark with Easter Unlimited, apart from certain conclusory statements regarding the strength and/or fame of its mark. (*See, e.g.*, ECF No. 49-5 Pl. Mem. in Supp. at p. 16 (Plaintiff states, without more, that "the strength of Plaintiff's mark cannot be disputed.").) Plaintiff has failed to present any evidence regarding relevant factors such as the actual duration of the use of its mark or sales volumes involving its mark. *Nature's Best*, 323 F. Supp. 2d at 432. At most, Plaintiff's trademark registration indicates that the trademark's first use in commerce was May 30, 2010. (ECF No. 14-2, Am. Compl. Ex. 3, USPTO Reg. No. 4,256,208, at p. 1.) This lone piece of evidence, accompanied

only by conclusory statements in Plaintiff's motion papers, does not tilt the "strength of the mark" *Polaroid* factor in favor of Plaintiff.

As Defendant correctly argues, Plaintiff has failed to submit any evidence showing that its mark is associated with Plaintiff or any other a single source and thus the mark has acquired secondary meaning. (*See* ECF No. 50, Def. Mem. in Opp. at p. 8.) Therefore, the Court considers that Plaintiff's mark lacks distinctiveness in the marketplace, and thus is weak. Based on the foregoing analysis of the mark's descriptiveness and the lack of evidence of the mark's distinctiveness in the marketplace, the Court finds the Plaintiff's trademark to be weak. The "strength of the mark" *Polaroid* factor favors Defendant.

## 2. Similarity of the Marks

The next Polaroid factor is the "similarity of the marks," where "similarity" is a "holistic consideration that turns on the marks' sight, sound, and overall commercial impression under the totality of the circumstances." *Akiro LLC v. House of Cheatham, Inc*., 946 F. Supp. 2d 324, 334 (S.D.N.Y. 2013) (citing *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir.2005)). Under this *Polaroid* factor, the Court must examine "the similarity between the plaintiff's and defendant's marks." *Tiffany & Co*., 971 F.3d at

85, n. 5, (citing *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009)).

The Court first considers the "sight" and "sound" similarities between Plaintiff's registered trademark and Defendant's Scary Terry cartoon. As a preliminary matter, the Court notes that Defendant's Scary Terry cartoon does not use any words apart from "Scary Terry" and therefore the Court cannot compare any similarity in sound. As to sight, Plaintiff argues that because Mr. Rozier has admitted he wanted to invoke the *Scream* mask, "Defendant's mark was intended to be as close to Ghost Face as it could be." (ECF No. 49-5, Pl. Mem. in Supp. at p. 16.) A comparison of Plaintiff's mark and Defendant's cartoon shows that both Defendant's Scary Terry cartoon and Plaintiff's mark feature a white mask with a black eyes and mouth. (*See* Def. 56.1 ¶ 19; *see also* ECF No. 14-2, Am. Compl. Exhibit 3, USPTO Reg. No. 4,256,208, at p. 1.) Analyzing the similarity between the two, Plaintiff's composite registered trademark is significantly more detailed than the cartoon mask featured on the Scary Terry merchandise. More specifically, the Scary Terry merchandise only features a child-like cartoon replica of Plaintiff's Ghost Face Mask, but not the same body, hands, knife, complete set of colors, or the accompanying "Ghost Face" text that Plaintiff's registered trademark includes, and instead uses "Scary Terry" as the accompanying text. Moreover,

the Scary Terry cartoon includes a cartoon green Celtics uniform on a child-like cartoon likeness of Mr. Rozier.  Though both images feature a version of the Ghost Face Mask, the Plaintiff's mark and Mr. Rozier's cartoon are not ultimately very similar.

The Court must conduct more than a "side by side comparison [of the marks]," and address the second factor with an eye to the key question: consumer confusion. *Sarelli*, 322 F. Supp. 3d at 433 (quoting *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 446 (S.D.N.Y. 2017) ("[A] court must assess whether a customer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with the defendant's mark alone.") (internal quotation marks and citations omitted).  *Id.*  Courts should "consider their 'overall impression,' including 'the context in which they are found and the totality of factors that could cause confusion among prospective purchasers.'"  *Sarelli*, 322 F. Supp. 3d 413, 433 (S.D.N.Y. 2018) (quoting *Advance Mag. Publishers, Inc. v. Norris*, 627 F. Supp. 2d 103, 117 (S.D.N.Y. 2008) (quoting *Gruner + Jahr*, 991 F.2d at 1078.

In addition to the lack of similarity between the marks, Plaintiff has not proffered evidence of consumer confusion.  For example, Plaintiff does not present evidence of precisely where its mark appears, or on which products, apart from noting that its products "may not be sold in the same

stores" as Defendant's apparel, and that both its products and Defendant's apparel are "available for purchase online." (Geller Decl. at ¶ 57.) Plaintiff does state, without identifying specific products beyond the Ghost Face Mask, that Plaintiff "designs, manufactures and markets products for Halloween, Easter, Valentine's, St. Patrick's, Christmas and patriotic occasions." (*Id.* at ¶ 4.) Plaintiff also states, without providing any further evidence, that "Plaintiff also licenses its intellectual property for use on items such as t-shirts bearing its trademarked Ghost Face image." (*Id.* at ¶ 43.) Defendant's declaration states that the Scary Terry merchandise appeared in the context of Mr. Rozier's basketball fans: the merchandise was marketed through his social media and a dedicated website. (Def. 56.1 at ¶¶ 21, 36.) Defendant also declares that he sold the Scary Terry shirts directly with his team, marketing on Instagram and selling his shirts through the dedicated website; Defendant further states that his management team mailed out the t-shirt orders themselves "so [his] fans could wear them at the games[.]" (ECF No. 52-12, Rozier Decl. at ¶ 38.) In addition to utilizing social media marketing and directly fulfilling orders placed through a dedicated website, Defendant states that Barstool Sports and two small retail stores sold his Scary Terry t-shirts. (*Id.* at ¶¶ 39-40.) The contrasting dearth of evidence from Plaintiff regarding a

68

complete commercial portrait of Plaintiff's market for its
products constrains the Court's analysis as to the "similarity"
*Polaroid* factor, even when drawing inferences in Plaintiff's
favor on Defendant's motion.

Accordingly, given the obvious aesthetic differences
between Defendant's Scary Terry cartoon and Plaintiff's mark,
the lack of evidence of consumer confusion as to the overall
commercial context for Plaintiff's products, and the Defendant's
evidence demonstrating the sports-specific, niche market for
Defendant's products, the Court finds that this factor is
neutral because the Court cannot determine whether there is
consumer confusion. Thus, the "similarity" *Polaroid* factor does
not favor either party.

### 3. Proximity of Products and 4. "Bridge the Gap"

The third and fourth *Polaroid* factors, respectively,
address the proximity of the goods or services at issue and the
possibility that the senior user will "bridge the gap," or
expand the scope of its business and enter the market of the
junior user. *Sarelli*, 322 F. Supp. 3d at 434 (citing *Akiro*, 946
F. Supp. 2d at 335; *U.S. Polo Ass'n, Inc. v. PRL USA Holdings,
Inc.*, 800 F. Supp. 2d 515, 531 (S.D.N.Y. 2011), aff'd, 511 F.
App'x 81 (2d Cir. 2013). Courts analyzing these factors take
into account "whether and to what extent the [parties'] products
compete with each other[.]" *Joules Ltd. v. Macy's Merch. Grp.,*

*Inc.*, 695 F. App'x 633, 636 (2d Cir. 2017) (internal quotation marks and citations omitted).

As to the proximity of the products, and as referenced *supra* in the Court's analysis of the second *Polaroid* factor, based on the record before the Court, the parties' products do not currently appear to provide similar services to an overlapping consumer base.  Here, it is undisputed that Defendant marketed and sold his Scary Terry apparel to his fans and those visiting his social media and dedicated website. (Def. 56.1 at ¶¶ 21, 36.)  Defendant, in his own declaration, states that the market for his Scary Terry merchandise was directly connected to his fandom and basketball games, and the exhibits Mr. Rozier submitted as part of his declaration demonstrate that any associated media coverage of the Scary Terry clothing line was connected to Mr. Terry as a basketball player.  (*See* ECF No. 52-12, Rozier Decl. at ¶¶ 38-40; *see also* Rozier Decl. Exs. A-G.)  Plaintiff argues that "the Court need not stretch its imagination to find that t-shirts should be equitable to t-shirts," without providing any evidence regarding the existence and appearance of any of Plaintiff's t-shirts or apparel for the Court to evaluate as part of its analysis.  (ECF No. 49-5, Pl. Mem. in. Supp. at p. 16).  The closest proximity that Plaintiff identified between its products and Defendant's

products was that both sets of products are sold online. (Geller Decl. at ¶ 57.)

Importantly, Plaintiff has submitted a declaration that it currently licenses "its 'intellectual property' for use on items such as t-shirts and other merchandise bearing its trademarked Ghost Face image," and further alleges that it is always looking for new ways to market and/or license its products that will expand their appeal beyond Halloween sales." (ECF No. 49-2, Geller Decl. at ¶ 58.) Without providing any further specifics or evidence, Plaintiff argues that it is therefore likely that Plaintiff's products would be competing with Defendant's products. (*Id.*) In order for Plaintiff to demonstrate that it will "bridge the gap," such speculative intentions are insufficient, as a plaintiff must provide evidence of concrete plans. *See Khan v. Addy's BBQ LLC*, 419 F. Supp. 3d 538, 556 (E.D.N.Y. 2019). Plaintiff fails to provide any such evidence.

Ultimately, the Court finds that both these *Polaroid* factors favor Defendant. There is evidence demonstrating the niche market for Defendant's Scary Terry merchandise related to his professional basketball career, basketball games, and basketball fans, and a complete lack of evidence as to any of Plaintiff's plans to move beyond the holiday market Plaintiff currently occupies. There is no evidence in the record to

indicate that Plaintiff is presently or prospectively likely to be in competition with Defendant and his fan-specific market for NBA-oriented Scary Terry merchandise featuring the cartoon likeness of Mr. Rozier and the *Scream*/Ghost Face Mask.  Nor is there any evidence in the record to indicate that the parties have an overlapping consumer base that would lead to confusion.

## 5. Actual Consumer Confusion

The fifth *Polaroid* factor involves any evidence that consumers are actually confused as to the origin of a particular product or service or as to whether the junior user of a mark is sponsored by or affiliated with the senior user.  *Sarelli*, 322 F. Supp. 3d at 435.  Evidence of actual consumer confusion "may consist of anecdotal or survey evidence." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 672 (S.D.N.Y. 2016), aff'd sub nom. *LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017) (internal quotation marks and citation omitted).

There is no survey evidence in the record of actual consumer confusion.  Indeed, the only assertion Plaintiff has made as to consumer confusion is an anecdotal reference in the Geller Declaration, in which Mr. Allan Geller, vice president of Easter Unlimited, states: "[i]t has been brought to my attention that at least some of Plaintiff's customers have contacted us to inquire as to whether they could purchase 'Scary Terry' apparel

from Plaintiff." (ECF No. 49-2, Geller Decl. ¶ 59.) Even if
this vague double-hearsay statement were admissible, Plaintiff
provides no further details as to these allegedly confused
customers, and has not offered any other fact or admissible
evidence that shows actual consumer confusion. This *Polaroid*
factor favors Defendant.

### 6. Bad Faith

The sixth *Polaroid* factor requires the Court to assess
whether Defendant has acted in bad faith. Under this factor,
the key question is whether Defendant attempted "to exploit the
good will and reputation of a senior user by adopting the mark
with the intent to sow confusion between the two companies'
products." *Tiffany & Co.*, 971 F.3d at 88 (quoting *Star Indus.*,
412 F.3d at 388).

Here, as discussed *supra* in the Court's copyright fair
use analysis regarding parody and satire, Defendant has
explicitly conceded that he wished to invoke the *Scream* mask
from the movie *Scream*. But Defendant's concession does not
necessarily compel a conclusion that Defendant's use was
undertaken in bad faith to confuse or deceive purchasers. *See
Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114,
123 (2d Cir. 2001) ("the intent to compete by imitating the
successful features of another's product is vastly different
from the intent to deceive purchasers as to the source of [one's

own] product.") (internal quotation marks and alterations
omitted).  Plaintiff offers no evidence that Mr. Rozier intended
to deceive purchasers as to the source.  Plaintiff concedes that
Defendant expressly wanted to use the *Scream* mask (not the
standalone Ghost Face Mask), but argues, without offering any
evidence, that this intention is evidence that "Defendant sought
to misappropriate a known, existing and famous mark for his own
purpose and to capitalize on the mark's goodwill[.]'"  (ECF No.
49-5, Pl. Mem. in Supp. at p. 17.)  Plaintiff finally argues
that it does not matter whether Defendant understood the source
of the work he was using (*id.*), an argument irreconcilable with
caselaw, because the sixth *Polaroid* factor focuses on a junior
user's intention.  *See Bath & Body Works Brand Mgmt., Inc. v.
Summit Ent., LLC*, 7 F. Supp. 3d 385, 397 (S.D.N.Y. 2014)
(quoting *Lang v. Ret. Living Pub. Co., Inc.*, 949 F.2d 576, 583
(2d Cir.1991) (noting that the sixth *Polaroid* factor focuses on
whether a defendant used the mark with the intention of
capitalizing on plaintiff's reputation and goodwill.).
Defendant's undisputed stated intention, however, was to
reference the masked serial killer from the movie *Scream* for the
purposes of parody and satire, and not Plaintiff Easter
Unlimited's mark or its products.  (Def. 56.1 at ¶ 14.)
Defendant's intent, which is supported by statements and
evidence provided by both parties, cuts against the notion that

Defendant acted in bad faith, and does not show a desire to "sow confusion between the two companies' products[.]" *Star Indus.*, 412 F.3d at 388.

Regardless of the absence of evidence of bad faith in the record, the Court notes that the Second Circuit has cautioned that "subjective issues such as good faith are singularly inappropriate for determination on summary judgment." *Tiffany & Co.*, 971 F.3d at 88 (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996)). Based on the lack of evidence of Mr. Rozier's ill intent to deceive consumers, the Court concludes that no reasonable trier of fact could find Defendant acted in bad faith, and accordingly, the Court finds that the sixth *Polaroid* factor weighs in favor of Defendant.

### 7. Respective Quality of Products

The relative quality of the products involves two issues in tension with one another: if the quality of the junior user's product is low relative to the senior user's, then this increases the chance of actual injury where there is confusion, though a marked difference in quality actually tends to reduce the likelihood of confusion in the first instance. *Savin*, 391 F.3d at 460–61 (internal citations and quotations omitted). "Conversely, where the junior user's products are of

approximately the same quality as the senior user's, there is a greater likelihood of confusion[.]" (*Id.*)

Neither party expended time or effort articulating arguments or presenting evidence as to the seventh factor regarding quality of their products. (*See* ECF No. 49-5, Pl. Mem. in Supp. at p. 17 ("the quality of Defendant's product is largely irrelevant, since it is not the quality of the apparel or print that the Court need be concerned with.").) Regardless, because Plaintiff must offer evidence sufficient to create a factual issue, the Court finds that any equivalence in "quality between their products [was] unlikely to cause confusion," and finds that this factor tips in favor of Defendant. *Tiffany & Co.*, 971 F.3d at 88. Given the lack of evidence from either party on this factor, however, the Court will afford the "quality of the products" Polaroid factor little importance.

### 8. Sophistication of Relevant Population of Consumers

Under the final *Polaroid* factor, the Court must focus on "the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.'" *Star Indus.*, 412 F.3d at 390 (internal citations omitted). In general, "the more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace." *Savin*, 391 F.3d at 461.

As to the eighth *Polaroid* factor, the parties do not cite to any record evidence regarding the relative sophistication of their consumers. In fact, Plaintiff states that "this would likely be a question of fact that cannot necessarily be answered at this time." (ECF No. 49-5, Pl. Mem. in Supp. at p. 17.) Plaintiff further argues that the consumer base for its products might span a wide range, "from any random trick-or-treater at the low end of the spectrum," to "comic or horror enthusiasts in the mid-range, to retailers at the higher end," while Defendant's consumers "likely occupy the lower end of the spectrum." (*Id.*)

Defendant, in turn, states in a conclusory fashion that "[i]f anything," this factor favors Defendant because "[a]ny fan of Rozier who is motivated enough to purchase apparel advertising that fandom can be expected to take care to determine whether the Rozier merchandise being purchased is affiliated with Rozier and not some other brand." (ECF No. 52-22, Def. Summ. J. Mem. at p. 23.)

Based on the lack of record evidence, the Court cannot conclude whether the eighth "consumer sophistication" *Polaroid* factor favors either party.

***

After reviewing each Polaroid factor and weighing all eight factors on balance, the Court finds that the factors weigh

in Defendants' favor and against a finding of likelihood of consumer confusion.  The Court recognizes that the *Polaroid* inquiry cannot be reduced to a mechanical counting exercise. *Sarelli*, 322 F. Supp. 3d at 438-39 (internal citations and quotations omitted).  Even so, the Court notes that not a single factor weighs in favor of Plaintiff, while other factors are inconclusive or neutral based on an absence of evidence in the record. The rest of the factors weigh in favor of Defendant and ultimately a low likelihood of consumer confusion.

Summary judgment is appropriate only "where the undisputed evidence would lead only to one conclusion as to whether confusion is likely." *Cadbury*, 73 F.3d at 478. Accordingly, based on the relevant factors and on the current evidence in the record, the Court finds that no reasonable jury could find a likelihood of consumer confusion as to the origin or source of Defendant's Scary Terry merchandise.  Moreover, the Court finds that no reasonable jury could find that there was a likelihood of confusion between Mr. Rozier's Scary Terry merchandise and the Ghost Face merchandise of Plaintiff, Easter Unlimited.  Finally, the Court notes that, though Defendant's stated intention was to reference the *Scream* mask (Easter Unlimited's licensed copyright), the Court does not discount the importance of the underlying parodical and satirical message behind the Scary Terry cartoon. The parodical and satirical

qualities of the images on the Scary Terry merchandise
ultimately cut against a likelihood of consumer confusion.  *See*
*Tommy Hilfiger*, 221 F. Supp. 2d at 420 ("Rather, defendant's use
of the mark is an obvious parody or pun, readily so perceived,
and unlikely to cause confusion among consumers.").  Summary
judgment for Defendant as to trademark infringement is therefore
appropriate and granted.  *Id.* at 438-39.

### B. Trademark Counterfeiting

Plaintiff alleged a claim for federal trademark
counterfeiting under 15 U.S.C. § 1114(1)(a).  Under the Lanham
Act, "[a] counterfeit is a 'spurious mark which is identical
with, or substantially indistinguishable from, a registered
mark.'"  *Tiffany & Co.*, 971 F.3d 74, 95 (2d Cir. 2020) (citing
*Kelly-Brown*, 717 F.3d at 314 (quoting 15 U.S.C. § 1127)).
Defendant moves for summary judgment on Plaintiff's trademark
counterfeiting claim; Plaintiff's partial motion for summary
judgment does not.  Defendant provides no substantial argument
as to its motion for summary judgment on this claim, apart from
stating in a footnote, in relevant part, that "[b]ecause Easter
Unlimited cannot prove trademark infringement, it is not
necessary to address whether it can prove counterfeiting." (ECF
No. 52-22, Def. Summ. J. Mem. at p. 14, n. 3.)

Though Defendant's exceedingly brief argument does not
fully address why summary judgment in his favor is appropriate

as to the counterfeit claim, there is an established relationship between trademark infringement and counterfeiting. *See Tiffany & Co.*, 971 F.3d at 95, n. 18 ("Counterfeiting is merely an aggravated form of infringement[.]"); *see also Energizer Brands, LLC v. My Battery Supplier, LLC*, No. 19-cv-6486 (AMD), 2021 WL 1176105, at *3 (E.D.N.Y. Mar. 29, 2021) ("Consumer confusion over counterfeit goods is typically measured by the nine *Polaroid* factors[.]")

Moreover, there is no evidence in the record indicating that Defendant's allegedly infringing Scary Terry cartoon is 1) being used as a mark, or 2) identical to or substantially indistinguishable from Plaintiff's registered trademark. *See Grazette v. Bitcoin of Am., LLC*, No. 19-cv-4837 (MKB), 2020 WL 6789352, at *10 (E.D.N.Y. Sept. 30, 2020) (quoting *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 472 F. App'x 19, 22 (2d Cir. 2012) "The Lanham Act defines as counterfeit 'a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.'" (quoting 15 U.S.C. § 1127). As discussed *supra*, Defendant's Scary Terry cartoon is noticeably, visibly aesthetically different from Plaintiff's registered mark. (*See* Def. 56.1 ¶ 19; *see also* ECF No. 14-2, Am. Compl. Ex. 3, USPTO Reg. No. 4,256,208, at p. 1.); *see also Kelly-Brown*, 717 F.3d at 314-15 (mark was not counterfeit where "consumers ... would recognize

the differences ... from a cursory visual inspection" based on different "font, color, and capitalization.")  The Court, having found that no trademark infringement exists in the instant action, and finding that no reasonable jury could conclude that Defendant's Scary Terry cartoon was a counterfeit, grants summary judgment for Defendant as to Plaintiff's trademark counterfeiting claim.

### C. Trademark Dilution by Blurring

Though Plaintiff Easter Unlimited raised the claim of trademark dilution by blurring in its original and amended complaints, Plaintiff failed to address or respond to Defendant's motion for summary judgment as to dilution by blurring.  Plaintiff's failure to address Defendant's argument alone is a sufficient ground on which to consider this claim abandoned.  *See Petrisch v. HSBC Bank USA, Inc*., No. 07-cv-3303 (KAM), 2013 WL 1316712, at *17 (E.D.N.Y. Mar. 28, 2013) (quoting *Taylor v. City of New York*, 269 F. Supp.2d 68, 75 (E.D.N.Y.2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").  Even if Plaintiff had not failed to respond to Defendant's argument, summary judgment is granted for Defendant as to dilution by blurring, based on the facts in the record.  Plaintiff's mark does not qualify for dilution protection.

Under federal law, an owner of a "famous, distinctive mark" is entitled to an "injunction against the user of a mark that is 'likely to cause dilution' of the famous mark." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 477 F.3d 765, 766 (2d Cir.2007) (per curiam) (quoting 15 U.S.C. § 1125(c)(1)). Accordingly, in order to qualify for dilution protection, the mark must be "famous" and "distinctive." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009). "[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C.A. § 1125. The Trademark Dilution Revision Act of 2006 ("TDRA") sets out four non-exhaustive factors that courts may consider in "determining whether a mark possesses the requisite degree of recognition" to be considered "famous":

> [1][t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; [2][t]he amount, volume, and geographic extent of sales of goods or services offered under the mark; [3][t]he extent of actual recognition of the mark; [4][w]hether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 307 (S.D.N.Y. 2007).

Even drawing all inferences in favor of the non-moving
Plaintiff, the Court finds that there are no triable questions
of fact as to the dilution by blurring claim.  As noted *supra*,
Plaintiff appears to conflate the fame of the *Scream* franchise
and the Ghost Face Mask's associated fame with the actual
distinctiveness of Easter Unlimited's own mark.  In response to
Defendant's motion for summary judgment, Plaintiff asserts that
"[t]he Ghost Face® Mask has been a famous copyright and
*trademark* of Plaintiff's from the time of their initial
registrations through today, and is known throughout the
world[,]" and "[t]he Ghost Face Mask has been a famous copyright
and *trademark* of Plaintiff's for many years."  (Pl. 56.1, at ¶¶
17, 22.) (emphasis added.)  Plaintiff does not submit any
evidence or proffer any facts—apart from its trademark
registration and certain conclusory statements—regarding the
fame and distinctiveness of its mark.  (*See, e.g.*, ECF No. 49-5
Pl. Mem. in Supp. at p. 16 (Plaintiff states, without more, that
"the strength of Plaintiff's mark cannot be disputed.").)  The
Court has no relevant facts or evidence presently before it that
would permit the Court to engage in an analysis as to the
duration, extent, and geographic reach of advertising and
publicity of the mark, the amount, volume, and geographic extent
of sales of goods or services offered under the mark, or the

extent of actual recognition of the mark. *Dan-Foam A/S*, 500 F. Supp. 2d 296, 307 (S.D.N.Y. 2007).

Though Defendant disputes Plaintiff's broad assertions as to the fame of Plaintiff's mark, Defendant argues that, though the Ghost Face Mask itself is "indisputably 'famous' as a result of *Scream*, [...]the mask is not a 'famous' mark for Easter Unlimited because the public associates it with *Scream*, not Easter Unlimited[.]" (ECF No. 50-1, Def. Resp. to Pl. 56.1 at ¶ 22; *see also* ECF No. 52-22, Def. Summ. J. Mem. at p. 24.) The Court agrees with this important distinction between the fame of *Scream* and the Plaintiff's actual mark and its association with Easter Unlimited.

Summary judgment may be granted if the moving party shows that a reasonable jury could not return a verdict for Plaintiff. *See Knowles-Carter v. Feyonce, Inc.*, 347 F. Supp. 3d 217, 223 (S.D.N.Y. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) ("the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."). Summary judgment is appropriate where, as here, "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Knowles-Carter*, 347 F. Supp. 3d at 223 (quoting *Smith v. County of Suffolk*, 776 F.3d 114, 121 (2d

Cir. 2015)).  Given the facts and evidence currently in the record, the Court finds that it must grant summary judgment for Defendant as to dilution by blurring, as there are no material issues of disputed fact as to dilution, and Defendant is entitled to judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment is DENIED.  Defendant's cross-motion for summary judgment is GRANTED on all claims.  The Clerk of Court is respectfully directed to enter judgment in favor of Defendant and close this case.

**SO ORDERED.**

DATED:      September 27, 2021
            Brooklyn, New York

                                    /s/ Kiyo A. Matsumoto
                                    Kiyo A. Matsumoto
                                    United States District Judge